## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF KANSAS

**Justin Spiehs**

Plaintiff

v.

**The Lawrence City Commission, as the governing and legislative body of the City of Lawrence, Kansas**
*

**Board of Directors of the Free Public Library of the City of Lawrence, Kansas**
*

**Kathleen Morgan**, in her individual capacity as Director of Development & Community Partnerships for the Lawrence Public Library
*

**Marc Veloz**, in his individual capacity as Community Resource Specialist for the  Lawrence Public Library
*

**Sara Mathews**, in her individual capacity as Outreach Coordinator for the Lawrence Public Library
*

**Heather Kearns, in her individual capacity**
*

**Karen Allen, in her individual capacity**
*

**Lauren Taylor, in her individual capacity**
*

**Tristan Star, in his individual capacity**
*

**Polli Kenn, in her individual capacity**

Defendants

Case No. 24-4016-JAR-BGS

## AMENDED COMPLAINT

COMES NOW the plaintiff Justin Spiehs, by and through counsel, and for his Amended Complaint against each defendant, hereby states as follows:

## JURISDICTION AND VENUE

1. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

3. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

## THE PARTIES

4. Plaintiff Justin Spiehs is a natural person, citizen of Kansas, and legal resident of Douglas County, Kansas. Dr. Spiehs has a doctorate degree in Lifespan Human Development and a Masters in Marriage and Family Therapy.

5. The Lawrence City Commission is the governing and legislative body of the City of Lawrence, Kansas.

6. The Public Library of the City of Lawrence is a municipal public body and a quasi-political subdivision of the City of Lawrence, Kansas.

7. Board of Directors of the Free Public Library of the City of Lawrence, Kansas, is a governing body appointed by the Lawrence City Commission and is funded by the

City of Lawrence under Charter Ordinance No. 16.   The Lawrence Public Library exists pursuant to the provisions of K.S.A. 12-1222, with powers and duties as provided in K.S.A. 12-1215 and K.S.A. 12-1225 and under the Lawrence Charter Ordinance #16.

8. Kathleen Morgan is an employee of the City of Lawrence and is sued in her individual capacity as Director of Development & Community Partnerships for the Lawrence Public Library and was present and participated with the other defendants in the removal of the plaintiff from the Library on May 17, 2023

9. Marc Veloz is an employee of the City of Lawrence and is sued in his individual capacity as Community Resource Specialist for the Lawrence Public Library and was present and participated with the other defendants in the removal of the plaintiff from the Library on May 17, 2023

10. Sara Mathews is an employee of the City of Lawrence and is sued in her individual capacity as Outreach Coordinator for the Lawrence Public Library and was present and participated with the other defendants in the removal of the plaintiff from the Library on May 17, 2023

11. Heather Kearns is an employee of the City of Lawrence, Kansas.  Defendant Hearns is sued in her individual capacity and was present and participated with the other defendants in the removal of the plaintiff from the Library on May 17, 2023.

12. Karen Allen is an employee of the City of Lawrence, Kansas.  Defendant Allen is sued in her individual capacity and was present and participated with the other

defendants in the removal of the plaintiff from the Library on May 17, 2023 and June 11, 2023.

13. Lauren Taylor is an employee of the City of Lawrence, Kansas.  Defendant Taylor is sued in her individual capacity and was present and participated with the other defendants in the removal of the plaintiff from the Library on May 17, 2023.

14. Tristan Star is an employee of the City of Lawrence, Kansas.  Defendant Star is sued in his individual capacity and was present and participated with the other defendants in the removal of the plaintiff from the Library on May 17, 2023 and June 11, 2023.

15. Polli Kenn is an employee of the City of Lawrence, Kansas.  Defendant Taylor is sued in her individual capacity and was present and participated with the other defendants in the removal of the plaintiff from the Library on June 11, 2023.

16. Lauren Taylor is an employee of the City of Lawrence, Kansas.  Defendant Taylor is sued in her individual capacity and was present and participated with the other defendants in the removal of the plaintiff from the Library on May 17, 2023.

17. The Public Library of the City of Lawrence, the Board of Directors of the Free Public Library of the City of Lawrence, the City of Lawrence, Kathleen Morgan, Marc Veloz, Sara Mathews, Heather Kearns, Karen Allen, Lauren Taylor, Tristan Star, and Polli Kenn , are collectively referred to as "the Library Defendants."

## STATEMENT OF FACTS

*Incidents at the Lawrence Public Library*

18. The Lawrence Public Library is a public forum.

4

19. On May 17, 2023, the public was invited to an event hosted by the Library about the topic of "gender markers" related to legal documents. This event was held in anticipation of the Kansas gender legislation that would take effect on July 1, 2023.

20. The Lawrence Times stated that "the Lawrence Public Library is teaming up with Kansas Legal Services to hold a free clinic to help transgender people get their gender markers changed on their Kansas birth certificates and IDs."

21. The paper stated the "clinic will be a hybrid in-person and online info session. It's set for 6 to 7:30 p.m. Wednesday, May 17 in the library auditorium, 707 Vermont St. Join the meeting virtually via Zoom at this link. Learn more on the library's event page."

22. The Libraries event page https://tinyurl.com/5b8vpa7h stated:

In partnership with Kansas Legal Services, join us for an emergency informational session about getting gender marker change paperwork submitted and processed before Senate Bill 180 goes into effect this summer. Ellen Bertels, Kansas Legal Services Attorney, will lead a presentation about the current pathways to making gender marker changes on state-issue ID & documentation in KS on your own (pro se). Kansas Legal Services can help to answer your questions about changing names and amending gender markers on birth certificates, social security records, passports, and KS identification cards and driver's licenses.

23. The site further stated:

The zoom link for the virtual meeting is here: https://lplks.zoom.us/j/92928252034
About the presenter: Ellen Bertels is an attorney at Kansas Legal Services' Wichita office providing pro bono representation to transgender and nonbinary Kansans undergoing legal identity document corrections. Questions? Ask Marc: mveloz@lplks.org or Ellen: bertelse@klsinc.org.

24. Dr. Spiehs attempted to enter the Library with a sign that read "If you have a dick then you are not a chick." Dr. Spiehs friend attempted to enter the library with

a sign that stated "God didn't get it wrong. There are only 2 genders" with male and female gender signs drawn on it.

25. Dr. Spiehs did not plan on verbally communicating anything but rather to sit silently while displaying those signs. Upon entry into the library, Spiehs and his friend initially stood silently at the entrance of the Library auditorium in which the event was to be held.

26. When the Library auditorium doors opened for the public, Dr. Spiehs attempted to enter but then was confronted by library employee Marc Veloz.  Mr. Veloz attempted to stop Dr. Spiehs from entering.  The doors to the auditorium were then locked from the outside with attendees of the event inside the Library auditorium further preventing Dr. Spiehs' entry.  Multiple library employees gathered around Dr. Spiehs and his friend while they were physically prevented from entering the Library's auditorium.

27. Among the employees were Kathleen Morgan, Sarah Mathews, and an private security guard.  They all insisted that Dr. Spiehs and his friend could not attend the event displaying the signs.

28. This woman blocked Dr. Spiehs saying that he was displaying "hateful speech"



This woman continued to prohibit Dr. Spiehs from entering while allowing other to enter. The Library defendants approved and ratified this woman's actions.



29. The woman calls on her telephone and says she is reporting Dr. Spiehs identifying by clothing and race. It is believed this woman called the police. She tells other Library defendants about getting a "restraining order."



30. Next Library defendant also tells Dr. Spiehs he cannot enter if he intends to protest with his signs. Dr. Spiehs tells her he is there to learn.

31. At least six Library defendants appear:



32. Another Library defendant in red shoes with "security" on his shirt then claims that Dr. Spiehs has made some individuals "feel unconformable."



33. Next another Library defendant appears and they claim it was a "private event."



Police arrived.



The woman blocking the door who made the call tells the police some untrue statements: that Dr. Spiehs had been "harassing us," "filming us" "filming minors," that it was a "private event," he "posted on Facebook," "he yells at us" "he's not welcome, the signs are offensive to every transperson." The policeman said "welcome to freedom of speech" and then told Dr. Spiehs "but you don't get to be a dick either." The police and the library defendants displayed a unified show of force towards Dr. Spiehs.



34. The officer asked who was in charge and the woman below indicated she was the director of the Library and spoke to the police officer.



35. This Library defendant then represented that the event was "private" and that she wanted Dr. Spiehs to leave. The door was then locked in violation of Lawrence City fire code. A Library defendant stated the door was locked because of Dr. Spiehs' presence. The Library defendant then claimed that signs containing pictures were permissible but signs containing words were not.

36. The officer then tells Dr. Spiehs that based upon what the Library defendants had represented that he would consider it trespass if Dr. Spiehs remained on Library property and if he stayed he would be placed in the back of a police car.

37. The Library defendants insisted that Dr. Spiehs not only not be allowed in the room which was locked but that he had to leave the library property altogether based upon the "library rules."

38. The Library defendant then said "I will show you our behavior policy right now." She represented that it prohibited "incendiary" language. Then another Library defendant appeared in a white blacked line shirt and read parts of the Behavior Policy from a phone:



Dr. Spiehs then left the Library property under threat of being arrested for trespass for violating Library policy rules. Dr. Spiehs

39. On June 11, 2023, the Library hosted "Deja's Reading Rainbow." It was reported by the Lawrence Times with the following caption:



40. The paper stated:

> Deja Brooks, a local drag artist, will read and perform at the free event, set for 3:30 p.m. Sunday, June 11 at the Lawrence Public Library. The event will last about an hour, according to the Facebook event page.
> Deja's Reading Rainbow is "a story time about love and friendship, being different and belonging, being unique and being accepted, colors, rainbows, and, of course, fun," according to the event page.
> The event is open to all ages, according to the library.

41. The Library reported the event as follows:



42. The event is where a male adult "Deja Brooks" (real name Brandon Isman) dresses up as a woman and reads stories to children. Dr. Spiehs and three of his friends planned to silently attend the event while displaying their signs. Dr. Spiehs' sign stated "This is Wrong" and "Stop Grooming Kids."

43. Another sign of one of the friends stated "Deja is a Soul-less Parasite." But immediately upon entering the Library, Dr. Spiehs was again confronted by the same private security guard from the May 17th event. He told Dr. Spiehs that "we've been over this before with the signs" and he insisted that Dr. Spiehs could not attend the event if a disturbance was made. Dr. Spiehs stated that he was not going to be a

disturbance. Dr. Spiehs waited outside the same Library auditorium as the May 17th event.

44. While waiting for the doors to open, the security employee believed to be "Tristan" confronted Dr. Spiehs telling him "I know you want to be internet famous and all that" but that he wasn't going to allow the signs like that which "make people feel uncomfortable." He told Dr. Spiehs that "we aren't a public library technically."



45. This employee and another Library defendant employee stood nearby and appeared to be reviewing some kind of library literature or policy.



 

46. Dr. Spiehs had two signs "This is wrong" and "stop grooming kids" which he displayed while waiting outside while the two Library defendants looked at the document.

47. Those two individuals then were joined by library employee Phillip Howard and another library defendant employee.





48. The three then gave each other a hug after reviewing the paperwork



49. When the doors to the event were opened, Dr. Spiehs entered with his signs and proceeded to sit together as a group. As they sat waiting for the start of the event the unnamed security guard and another library employee. Erica Segraves continued to group with the other employees looking at a paper.

50. Dr. Spiehs entered the auditorium. Dr. Spiehs placed his signs in the purse of one of his friends. Then when the event started they silently displayed their signs. Performer Deja Brooks then demanded that Dr. Spiehs' friend put her sign away. The private security employee then confronted Dr. Spiehs and claimed that Dr. Spiehs was being disruptive although Dr. Spiehs had not said anything. The Library employees were close by and watched while this occurred.

51. The security employee stated that Dr. Spiehs had to leave or he would call the police and have Dr. Spiehs cited for trespass. Up to that point neither Dr. Spiehs nor his friends had said anything. Then two Lawrence Municipal police officers entered the auditorium.

52. Because of the demand of the security officer and the presence of police, Dr. Spiehs complied and left the Library. The security guard also initially demanded that all the people sitting with Dr. Spiehs had to leave but they insisted that since they didn't have any signs that they didn't have to leave. They were allowed to remain at the event.

**FIRST CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Declaratory and Injunctive Relief**
**Facial Challenge**

53. Under 42 U.S.C. §§ 1983 and 1988, Dr. Spiehs is entitled to appropriate relief invalidating Defendants' challenged policy and related conduct.

54. At all times relevant to this Complaint, each and all of the acts and policy alleged herein were attributed to Defendants who acted under color of a statute, regulation, or custom of the State of Kansas (i.e., under color of state law and authority).

55. On information and belief, the plaintiff believes he was denied admittance and removed from the Library, as described in this Amended Complaint, on the basis of the Library defendants invoking a policy it calls a "Behavior Policy" published at https://tinyurl.com/2u6. The Policy states in part that:

20

**Policy Statement:**

The Library is committed to providing a safe and respectful environment for all its users. Behavior that disturbs others' use of the library, creates an unsafe environment, impedes the work of library staff, or creates a risk of damage to library property is not permitted. Behavior that violates local, state, and/or federal laws is prohibited. These behavior expectations apply to all library property, both inside and outside of the building. Additionally, these expectations apply wherever library service interactions occur.

56. The Behavior Policy also states the following:

Library users are expected to respect staff requests to stop unacceptable behavior. Those who violate this policy may simply be asked to correct the behavior, but may also be asked to leave the Library for the day, have their phone or online communication terminated or deleted, have Library privileges and/or access suspended, or be subject to legal action depending on the severity of the behavior. Appeals may be made to the Safety and Security Supervisor or designee. For some examples of unacceptable behaviors in the library, please refer to the list below.

**Unacceptable behavior in the Library includes, but is not limited to:**
1. Being under the influence of or in possession of alcohol or illegal drugs
2. Smoking in the Library or within 25 feet of the Library entrances (includes the use of any tobacco products, e-cigarettes, and electronic smoking devices)
3. Using obscene, threatening, harassing, or abusive language or gestures - including abusive language and gestures directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics
4. Fighting, physical assault, verbal or written threat of violence
5. Carrying a weapon into the Library unless authorized by law; unconcealed firearms are prohibited in the Library
6. Bringing an animal into the Library with the following exceptions:

   a. an animal that is part of a Library-approved program
   b. a service animal (a dog) that is individually trained to do work or perform tasks for a person with a disability or
   c. a qualifying miniature horse
7. Tethering an animal on Library grounds
8. Using electronic devices without earphones or at a volume that disturbs others
9. Prolonged or chronic sleeping that causes significant disturbance to others or that limits access to entrances, exits, resources, or staff, lying on the floor, tables, or desks
10. Skateboarding, rollerblading, and bicycling in the Library or on the Library grounds
11. Soliciting, panhandling, or canvassing in the Library (except as expressly approved by the Library)

57. None of the Library defendants have identified which provision or provisions in the Behavior Policy that Dr. Spiehs purportedly violated on May 17 or June 11.

58. It may be that the Library defendants thought Dr. Spiehs was "canvassing" – attempting to gain political support for the subject matter or elicit responses, opinions, or sentiments on the subjects.

59. "Canvassing" is vague is overbroad impinging on free speech. The provision "approved by the Library" provides for unguided and arbitrary enforcement depending on the viewpoint of the "canvassing."

60. The Policy prohibits individuals from reading, viewing, or speaking about anything if it uses "obscene, threatening, harassing, or abusive language or gestures – including abusive language and gestures directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics"

61. The Behavior Policy prohibits "using" language and gestures the Library classifies as "obscene," "threatening," "harassing," and "abusive."

62. The Behavior Policy prohibits "using" language and gestures "directed at "race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics." *See Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021).

63. There is no legitimate governmental interest narrowly tailored to prohibit "using" language and gestures "directed at "race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics."

64. The phrase "directed at" is unconstitutionally vague and is subject to arbitrary enforcement. The Behavior Policy would prohibit individuals from evangelizing as to

22

any religious beliefs if that religious belief spoke disapprovingly or morally about race ethnicity, sexual orientation, ability, gender and identity, or personal characteristics.

65. The Behavior Policy prohibits anyone from "using" expressions of disapproval of transgenderism, homosexuality, tattoos, body piercing, or bestiality,

66. The Behavior Policy prohibits anyone at the Library from "using" expressions of disapproval for any of the purported 68 Gender Identities.    See https://www.healthline.com/health/different-genders

67. The terms "harassing," "abusive," "gestures" are unconstitutionally vague leaving the speech subject to a Heckler's veto. "Gender," "identity" and "other personal characteristics" are also unconstitutionally vague.

68. The Behavior Policy allows positive statements directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics but prohibits negative statements about the same subjects which is viewpoint discrimination.  The words "abusive," "threatening," and "harassing," are viewpoints which the Library defendants prohibit "using."

The word "using" is unconstitutionally vague and overbroad as it not only captures speech made by a person but in all speech available at the library through books, magazines, audio tapes and videos.  Reading any book at the library (whether brought in or taken off the shelf) that contained speech directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics which was also "abusive," "threatening," or "harassing" could be considered as "using" and thus prohibited.

69. Dr. Spiehs' First Amendment violation centers on three questions: (1) whether speech is protected, (2) the type of forum, and (3) the justification for restricting speech. *See Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997). Plaintiff's speech on each occasion cited in this Complaint was protected speech.

70. At the injunction and trial level, the burden is upon defendants to justify their actions. *See Greater Phila. Chamber of Commerce v. City of Phila.,* 949 F.3d 116, 133 (3d Cir. 2020) (In "First Amendment cases the initial burden is flipped"); *See Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 660 (2004) (same). The government bears the burden of proving the law is constitutional, tracking the burdens at trial. *Id.*

71. Each defendant bears the burden to show each and every reason each defendant suppressed Dr. Spiehs' speech and his subsequent removal was Constitutional. *See Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2426 (2022) ("Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the District").

72. Defendants cannot sustain their burden that each of their actions was Constitutional.

73. The Library Behavior  policy is unconstitutionally vague for these reasons: first, it does not provide people of ordinary intelligence with reasonable opportunity to know what is prohibited; and second, it authorizes arbitrary or discriminatory enforcement.

24

74. The defendants' policy and related practices are not narrowly tailored as applied to Dr. Spiehs because Dr. Spiehs' expression does not implicate any of the legitimate interests any defendant might have.

75. Unless the policy and conduct of the defendants are enjoined, Dr. Spiehs will continue to suffer irreparable injury to his First Amendment rights to petition government and to engage in protected speech.

**SECOND CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Declaratory and Injunctive Relief**
**As Applied Challenge**

76.  Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

77. The Library defendant  have arbitrarily interpreted the Behavior Policy to suppress and punish the content and viewpoint of Spiehs' speech on those dates.  The Library defendants interpreted the Behavior Policy as creating "private events" that excluded viewpoints,  The Library defendants ratified false statements made to police regarding Dr. Spiehs' conduct.

78. There is a credible or objectively justified fear of future enforcement of the Behavior Policy because there has been a past enforcement of the same statute or provision for the same conduct.

79. . The interpretation of the words and phrases identified in the Behavior Policy are  "irreparably clothed in subjectivity" and provides no standards to guide a library employee's discretion.  *Marshall v. Amuso*, 571 F. Supp. 3d 412, 424-25 (E.D. Pa. 2021).

## THIRD CAUSE OF ACTION
## Violation of Plaintiff's First Amendment Right to Freedom of Speech
## Retaliation
## (42 U.S.C. § 1983)

80. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

81. The Library Defendants each viewed Dr. Spiehs as someone who emboldened other speakers to express viewpoints the Library Defendants did not want to hear. Dr. Spiehs was clearly the most infamous and antagonistic speaker appearing before the City of Lawrence prior to October 2022 and afterwards.

82. The defendants targeted Dr. Spiehs because of his status and viewpoints and used each respective defendant's animosity and predispositions against plaintiff Spiehs and his political viewpoints to have the speaking policy arbitrarily interpreted in a discriminatory manner in order to deter expression of certain political positions, then punish and make Dr. Spiehs an example to the community.

83. Barring Dr. Spiehs from attending the library events is functionally a prior restraint, which is presumptively unconstitutional. *Neb. Press Assoc. v. Stuart*, 427 U.S. 539, 592 (1976). The library defendants preemptively banned Dr. Spiehs from speaking at a later public speaking section each evening which is unconstitutional. *See Mnyofu v. Bd. of Educ. of Rich High Sch. Dist. 227,* No. 15 C 8884, 2016 U.S. Dist. LEXIS 45773, at *2 (N.D. Ill. Apr. 5, 2016) (The Commission shut off the microphone in the midst of a citizen activist's speech).

84. The actions of the defendants were unreasonable, not narrowly tailored because prospectively banning a speaker without proof of dangerousness interferes with the

26

speaker's right to interact with elected representatives. *See Reza v. Pearce,* 806 F.3d 497, 500-01 (9th Cir. 2015). Under this policy, Dr. Spiehs was and continues to be subjected to open meeting bans for a purported speech code violation without any evidence of disruption or danger to anyone. This objectively and unreasonably chills speech. *See Walsh v. Enge,* 154 F. Supp. 3d 1113 (D. Or. 2015) (court enjoined enforcement banning speakers from city council chambers).

85. Dr. Spiehs has a First Amendment right to access this public library which is a designated public forum. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012) (public library is a designated, rather than a limited, public forum). Regulations on speech in public and designated public forums require more exacting scrutiny. *Cole v. Goossen*, 402 F. Supp. 3d 992, 1013 (D. Kan. 2019).

86. The public was invited to both library events. This Count implicates two distinct First Amendment interests: Dr. Spiehs right to engage in speech by displaying his signs, and his right to receive information through attendance at the Library events.

87. Dr. Spiehs had a right to receive information and to communicate information at the library event – both of those rights were unconstitutionally taken away the Library defendants. Both of Dr. Spiehs' signs were protected speech under the First Amendment.

88. Dr. Spiehs use of the word "dick" rhyming with "chick" is purposeful biological and cynical witticism. It is wholly truthful as the message is biologically sound. While Dr. Spiehs' wit may strike persons as innocuous, humorous, or vulgar, it is not obscene. A chief "function of free speech under our system of government is to invite

27

dispute," which commonly "induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Texas v. Johnson*, 491 U.S. 397, 408-09, (1989).

89. There is no question that these two interests are protected under the First Amendment. *See Stanley v. Georgia*, 394 U.S. 557, (1969) ("Constitution protects the right to receive information and ideas"); *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 867 (1982) ("right to receive ideas follows ineluctably from the sender's First Amendment right to send them").

90. Dr. Spiehs did not interrupt any speaker and none of his signs being displayed in silence did not actually disrupt any speaker from continuing to speak.  Dr. Spiehs did not engage in stomping of feet, whistling, making noise, or yelling.

91. Speech in a public forum cannot be discriminated against based on viewpoint, and the restriction must be "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985).

92. The quiet display of either of Dr. Spiehs' signs did not prevent other patrons from enjoying the library and did not otherwise endanger them through the display of his biological or political message on his signs.

93. The fact that this was viewpoint discrimination is evident: had Dr. Spiehs displayed a blank sign or signs that supported the transgender movement there would have been no adverse action taken against him by the Library employees.

94. The Library has a "Behavior Policy" published at  https://tinyurl.com/2u6.

95. The Library prohibits "using obscene, threatening, harassing, or abusive language or gestures – including abusive language and gestures directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics."

96. The terms "harassing," "abusive," "gestures" are unconstitutionally vague leaving the speech subject to a Heckler's veto. "Gender," "identity" and "other personal characteristics" are also unconstitutionally vague.

97. Whatever policy the Library employees were utilizing to prohibit Dr. Spiehs entry in to Auditorium or to suppress the quiet display of his signs, as applied to Dr. Spiehs this was intentional viewpoint discrimination. Dr. Spiehs was in compliance with any time, place, and manner restrictions the Library had that could have been reasonably and Constitutionally imposed by it upon Dr. Spiehs.

98. According to library personnel, Dr. Spiehs' first denial of access to the Library Auditorium was because of some prohibition against obscenity but Dr. Spiehs' sign did not meet the legal definition of being obscene.

99. On both occasions the Library was advancing or promoting a message regarding transgenders. It permitted the speakers to engage in a particular viewpoint on that topic but would not allow Dr. Spiehs to communicate silently through a sign a viewpoint the Library and it's the Library Defendants did not like.

100. The Library Defendants and each Library defendant purposed to suppress Dr. Spiehs' expression merely because public officials oppose his view on the topics being discussed at those two library events.

## FOURTH CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Content & Viewpoint Discrimination
### (42 U.S.C. § 1983)

101. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

102. The defendants suppressed and removed Dr. Spiehs because of the viewpoints he expressed at the library.

103. The Behavior policy contains viewpoint discrimination and is arbitrary and unreasonable.

104. The defendants' respective actions targeted certain viewpoints on a subject matter such as canvassing, gender, personal characteristics, homosexuality, gender identity, pedophilia and child grooming. . The Library defendants targeted Dr. Spiehs' particular views on those topics. Defendants restricted and punished Dr. Spiehs' views because of their respective specific motivating ideology, opinion, and perspective.

105. Defendants restricted and punished Dr. Spiehs' views because of his specific motivating ideology, opinion, and perspective.

106. Each defendant acted with a viewpoint-discriminatory purpose when Dr. Spiehs' speech was suppressed.

107. Each defendant acted with a viewpoint-discriminatory purpose when Dr. Spiehs was removed from the building and banned from returning that night.

## FIFTH CAUSE OF ACTION
### Violation of Plaintiff's Fourteenth Amendment Right to
### Equal Protection of the Law
### (42 U.S.C. § 1983)

108. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

109. Plaintiff is a "class of one" and alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215-16 (10th Cir. 2011).

110. "A violation of equal protection occurs when the government treats someone differently than another who is similarly situated." *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, Kan., 927 F.2d 1111, 1118 (10th Cir. 1991).

111. Dr. Spiehs has shown specific attendees  in this Amended Complaint who are comparators – similarly situated – to Dr. Spiehs who were allowed to attend the library events or remain in the Library.

112. Dr.  Spiehs is similarly situated to other visitors and attendees at the library. .

113. Defendants have chosen to take no adverse action against attendees  who communicate different messages on shirts, hats, signs, or any other medium when attending library events who support or endorse the viewpoints of the defendants, but they take adverse action against a speaker like Dr. Spiehs who has different viewpoints and brings up subjects that are personally offensive to the defendants or the message being conveyed at those drag-queen events.

114. After taking the many adverse actions against Dr. Spiehs for purportedly violating the Library Conduct code(s) or each defendant's own personal standards, , the defendants have knowingly refrained from taking the same adverse actions against other attendees who have express viewpoints that the defendants agree with or approve.

115. Defendants' customs, practices, and their enforcement have also been applied to discriminate intentionally against Dr. Spiehs' rights to freedom of speech, right to be free from compelled speech, right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

116. Defendants' Behavior Policy(s) and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to the Library Defendants' asserted interests unprohibited.

117. Defendants applied their Policy and related practices to Dr. Spiehs in a discriminatory and unequal manner, granting other attendees to the right to express their views utilizing messaging such as rainbow colors or other communicative means on the same topics and subjects as Dr. Spiehs attempted to communicate while denying that right to Dr. Spiehs, in violation of Dr. Spiehs' right to equal protection of the law under the Fourteenth Amendment.

## PRAYERS FOR RELIEF

WHEREFORE, the plaintiff requests that judgment be entered in his favor and against each defendant as follows:

B.  An order enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from ejecting or otherwise removing plaintiff Spiehs because of any claimed violation of the Behavior Policy concerning canvassing, or communicating about sexual orientation, ability, gender and identity, and other personal characteristics" or "using" language and gestures the Library classifies as "obscene," "threatening," "harassing," and "abusive." An order enjoining the Library Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from ejecting or otherwise removing plaintiff Spiehs from library events because of the silent display of a sign containing protected speech;

C.  An order enjoining  Library Defendants from enforcing  Library's other speech prohibitions or being removed as a consequence of violating the  Library's speech code;

D.  Declaratory relief consistent with the injunction, to the effect that the  Library Behavior  Code  with  its  speech  prohibitions  described  above  are unconstitutionally  void  and  unenforceable  as  they  violate  the  First Amendment  rights  of  free  speech  and  petition,  and  the  Fourteenth Amendment's guarantee of due process against vague laws;

E.  An award of actual damages to the plaintiff;

F.  An award of nominal damages to the plaintiff.

G. Against each individual defendant in their individual capacity an award of punitive and exemplary damages to the plaintiff;

H. Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988 and any other relief as the Court deems just and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable herein.

<u>/s/Linus L. Baker</u>
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:          913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff