IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Justin Spiehs<br><br>Plaintiff<br><br>v.<br><br>Kathleen Morgan *et al*<br><br>Defendants | Case No.   5:24-cv-04016-JAR-BGS<br><br>PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

**PLAINTIFF JUSTIN SPIEHS MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**STATEMENT OF FACTS**

1. Justin Spiehs has a doctorate in lifespan human development and a master's degree in marriage and family therapy, both from Kansas State University, and a bachelor's degree in human services with emphasis in addiction counseling from Washburn University. He previously worked in Kansas as a licensed marriage and family therapist and licensed addiction counselor. He was an assistant professor of family and human services at Washburn University.  He served honorably for 9 years in the U.S. Navy submarine service. Ex. 1, ¶1

2. Dr. Spiehs began reporting on the City of Lawrence as a citizen journalist in April 2022. Ex. 1, ¶1

3. Dr. Spiehs utilizes his encounters, as well as others, to report on his observations, and at times question other individuals in real time for reporting purposes.  He publishes using YouTube as his media. Ex. 1, ¶3

4. The Public Library of the City of Lawrence (the Library) is a municipal public body and a quasi-political subdivision of the City of Lawrence, Kansas. Ex. 1, ¶4

5. The Board of Directors of the Free Public Library of the City of Lawrence, Kansas, is a governing body appointed by the Lawrence City Commission and is funded by the City of Lawrence under Charter Ordinance No. 16. Ex. 1, ¶5.

6. Dr. Spiehs was present at the Library of the City of Lawrence Kansas on May 17 2023, and June 11, 2023, in which Dr. Spiehs took videos which are stipulated to as admissible in the Pretrial Order.  Ex. 1, ¶6

7. Kathleen Morgan is Director of Development & Community Partnerships for the Lawrence Public Library and was present and participated with the other defendants in his removal from the Library on May 17, 2023. Ex. 1, ¶7

8. Marc Veloz was a Community Resource Specialist for the Library and was present and participated with the other defendants in Dr. Spiehs' removal from the Library on May 17, 2023. Ex. 1, ¶8

9. Sara Mathews, Heather Kearns, Karen Allen, Lauren Taylor, Tristan Star, Polli Kenn, Lauren Taylor were all Library employees present and participating in Dr. Spiehs' removal from the Library on May 17, 2023, June 11, 2023, or both dates. Ex. 1, ¶9

10. The Library had and continues to have a "Behavior Policy" which deems "unacceptable behavior in the Library" as "Using obscene, threatening, harassing, or abusive language or gestures – including abusive language and gestures directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics." Ex. 1, ¶10

11. It also deems unacceptable behavior as "Soliciting, panhandling, or canvassing in the Library (except as expressly approved by the Library). Ex. 1, ¶11

12. On May 17, 2023, the public was invited to an event hosted by the Library about the topic of "gender markers" related to legal documents. Dr. Spiehs attempted to enter the Library with a sign that read "If you have a dick then you are not a chick." Ex. 1, ¶12

13. Dr. Spiehs' friend attempted to enter the library with a sign that stated "God didn't get it wrong. There are only 2 genders" with male and female gender signs drawn on it. Ex. 1, ¶13

14. Dr. Spiehs did not plan on verbally communicating anything but rather to sit silently while displaying those signs. Upon entry into the library, Dr. Spiehs and his friend initially stood silently at the entrance of the Library auditorium in which the event was to be held. Ex. 1, ¶14

15. When the Library auditorium doors opened for the public, Dr. Spiehs attempted to enter but then was confronted by library employee Marc Veloz. Mr. Veloz attempted to stop Dr. Spiehs from entering. Ex. 1, 15

16. The doors to the auditorium were then locked from the outside with attendees of the event inside the Library auditorium further preventing his entry. Heather Kearns, Tristan Star, Marc Veloz, Kathleen Morgan, Lauren Taylor, Sarah Mathews, and Karen Allen were library employees gathered around Dr. Spiehs and his friend while they were physically preventing Dr. Spiehs from entering the Library's auditorium. Ex. 1, ¶16

3

17. Dr. Spiehs witnessed these same individuals permit a woman to prohibit Dr. Spiehs from entering the Library meeting room. The woman called the Lawrence City Police and complained that Dr. Spiehs was violating the law. Ex. 1, ¶17

18. Those named individuals told Dr. Spiehs that he could not enter the meeting with his sign. Veloz told Dr. Spiehs that his signs made other individuals feel "uncomfortable." Ex. 1, ¶18

19. Kathleen Morgan and Heather Kearns told Dr. Spiehs that he could not enter the Library room because it was a private event. When Lawrence police arrived Kathleen Morgan told the officer that Dr. Spiehs was to be removed from the Library because of his signs. Dr. Spiehs was forced to leave the Library by these individuals using the Lawrence City police. Ex. 1, ¶19

20. On June 11, 2023, the Library hosted "Deja's Reading Rainbow" which stated "Deja Brooks, a local drag artist, will read and perform at the free event, set for 3:30 p.m. Sunday, June 11 at the Lawrence Public Library. The event will last about an hour, according to the Facebook event page. Deja's Reading Rainbow is "a story time about love and friendship, being different and belonging, being unique and being accepted, colors, rainbows, and, of course, fun," according to the event page. The event is open to all ages, according to the library." Ex. 1, ¶20

21. Dr. Spiehs and three of his friends planned to attend the event while displaying their signs without any verbal communications. Ex. 1, ¶21

22. Dr. Spiehs entered the Library with signs. His sign stated, "This is Wrong" and "Stop Grooming Kids." Another sign of one of his friends stated, "Deja is a Soul-less Parasite." Ex. 1, ¶22

23. When Dr. Spiehs entered the Library, he was again confronted by Tristan Star . He told Dr. Spiehs that "we've been over this before with the signs" and he insisted that Dr. Spiehs could not attend the event if a disturbance was made. Dr. Spiehs told him that he was not going to be a disturbance. Dr. Spiehs waited outside the same Library auditorium as the May 17th event. Ex. 1, ¶23

24. While Dr. Spiehs was waiting for the doors to open, Tristan Star confronted Dr. Spiehs telling him "Dr. Spiehs know you want to be internet famous and all that" but that he wasn't going to allow the signs like that which "make people feel uncomfortable." He told Dr. Spiehs that "we aren't a public library technically." Ex. 1, ¶24

25. Tristan Star, Karen Allen, Polli Kenn, and Phillip Howard stood together reviewing some paperwork. When they had finished reviewing the paperwork, Karen Allen, Polli Kenn, and Phillip Howard all hugged. When the doors to the event were opened, Dr. Spiehs entered with his signs and proceeded to sit together as a group. Ex. 1, ¶25

26. As they sat waiting for the start of the event Tristan Star and Karen Allen continued to group with the other employees looking at a paper. Dr. Spiehs entered the auditorium. Dr. Spiehs had placed his signs in the purse of one of his friends.

Then when the event started they all quietly and silently displayed their signs. Ex. 1, ¶26

27. The performer going by the stage name "Deja Brooks" demanded that they put their signs down. In response, Tristan Star again confronted Dr. Spiehs and claimed that Dr. Spiehs was being disruptive when Dr. Spiehs hadn't said anything and was sitting calmly and quietly making no movements. Ex. 1, ¶27

28. The individuals Dr. Spiehs named previously were close by and watched while this occurred. Tristan Star told Dr. Spiehs he had to leave or he would call the police and have Dr. Spiehs cited for trespass. Ex. 1, ¶28

29. Up to that point neither Dr. Spiehs nor his friends had said anything. Ex. 1, ¶29

30. Then two Lawrence City police officers entered the Library auditorium. Ex. 1, ¶30

31. Because of the demands of Tristan Star and Karen Allen, Dr. Spiehs felt he had no choice under threat of arrest by police but to leave involuntarily. Ex. 1, ¶31

32. Dr. Spiehs left under duress and threat of arrest. Ex. 1, ¶32

33. Tristan Star also told Dr. Spiehs' friends that because they were sitting next to Dr. Spiehs they too were being required to leave. They told Star that they didn't have any signs displayed. Star change his mind and permitted them to stay. The Free Speech Activities Policy of the Library states that

1. Free speech activities include, but are not limited to: holding or carrying signs, protesting, using expressive conduct or speech, distributing literature, acting as a public speaker, panhandling, and requesting signatures/donations/contributions.
2. Persons engaging in any free speech activities are referred to in this policy as "speakers."
3. "Sponsors" are a group(s) or individual(s) that reserve space in the library under the Reservable Room Policy and/or Public Event Policy.

4. A "designated partner" is an individual(s) or organization(s) who co-sponsors or is affiliated with a sponsor that reserves space in the library. The sponsor must identify a designated partner on promotion material to exempt their free speech activities from this policy.

1. The Library is a limited public forum dedicated to the peaceful study and enjoyment of visitors free from disturbance and unauthorized free speech activities by others.
2. Therefore, the Library will not permit free speech activities inside the Library that would interfere with study and enjoyment of visitors of the Library.
3. This policy does not apply to sponsors and their designated partners who reserve space in the library for programming under the Reservable Room Policy or Public Event Policy.
4. For information on free speech activities at library-sponsored events, please see the Public Event Policy.
5. For information on free speech activities at non-library sponsored events, please see the Reservable Room Policy.
6. For the safety and protection of speakers, library staff, and library patrons, speakers are permitted to engage in free speech activities outside of the Library in the public right-of-way. At no time is a speaker permitted to block or otherwise prevent ingress and egress from the Library.
7. Posters, pamphlets, or other printed information may not be placed on or attached to the buildings, walls, columns, lights, or other structural/ornamental features of the Library.
8. Aggressive or harassing behavior in violation of the law is strictly prohibited. If a speaker is in violation of the Policy, library staff must: (i) provide an oral warning to the speaker identifying the specific Regulations(s) the speaker has violated and ask the speaker to comply with the Regulation(s); (ii) if the speaker has been warned and does not comply, ask the speaker to leave the Library's premises; and (iii) if the speaker has been warned, the speaker has been asked to leave, and the speaker does not leave, notify police that the speaker is trespassing and advise the speaker that police have been notified. As soon as possible after the violation occurs and no later than the end of the following business day, library staff must document the violation in writing for inclusion in the Library's incident tracking database.
Ex. 1, ¶33; Ex. 2 (Policies).

34. The "incident tracking database" the Library refers to in its Speech Activities policy uses a software program called the "Patron Incident Tracking System" which Dr. Spiehs refers to as "PITS." Dr. Spiehs did not know it at the time but when he made open record requests of the Library he discovered that the Library, unknown to

the individual, places individuals in this PITS database meting out bans to the individual even though the individual doesn't know it. Ex. 1, ¶34

35. The Library claims the PITS database is not subject to Kansas Open Records law and claim those records are secret. Ex. 1, ¶35

36. The Library had security video footage of all of the incidents but failed to retain those records even after this lawsuit was filed. Ex. 1, ¶36

37. Brad Allen, who is the director of the Library, stated under oath that video recordings are not retained unless they involve a "security risk or criminal investigation." The Library did not retain any video recordings of Dr. Spiehs which means they did not consider anything Dr. Spiehs did to be a security risk or criminal. Ex. 1, ¶37

38. The PITS database lists Dr. Spiehs each time as a "Perpetrator" and then shows where he was "suspended" (meaning the Library has no trespassed Dr. Spiehs) even though it never provided to him notice of this punishment or why. The database also provides for "Victims" but it never claimed there was any so-called "victim" to any of Dr. Spiehs' actions. Ex. 1, ¶38

39. The PITS database provides for a "Behavior Matrix" which provides for an incremental increase in adverse consequences for behavior the Library deems unacceptable. For example, Dr. Spiehs was placed in the PITS database for purportedly "disregarding" the "direction of staff." When he was placed in the PITS database and given a "suspension" it means he was required to leave the Library or remain off Library premises until the duration of the suspension ends. In all cases

8

in which Dr. Spiehs was placed in the PITS database, he had no notice that he was placed in the PITS database, no notice as to why, no notice as to the consequence and no notice as to how to appeal these consequences. Ex. 1, ¶39

40. The PITS database provides for characterizing an individual's actions as "Behavior that is disruptive to others use of the library" but no one from the Library ever characterized his actions that way. Dr. Spiehs was never disruptive to anyone's use of the Library. Ex. 1, ¶40

41. According to the Library's PITS database which was provided to Dr. Spiehs in discovery, he was placed in it first on November 25, 2024, by Tristan Star using the description "disregarding the reasonable direction of staff." Unknown to him, according to the PITS database, Dr. Spiehs was placed in suspension. Ex. 1, ¶41

42. On November 25, 2024, Dr. Spiehs entered the Library and held up a piece of 11 x 16 inch paper with the words "Free Speech Died Here Ask Me How" while silently standing. Another individual, Michael Eravi, also came in and displayed a print out of the Library's Free Speech Activity Policy on a 8 ½ x 11 inch size piece of paper. The Library facilities manager Jon Ratzlaff, demanded that Dr. Spiehs stop displaying his paper. Ex. 1, ¶42

43. Ratzlaff instructed Dr. Spiehs to leave the library and when he did not, Ratzlaff called the police. When police arrived they told Dr. Spiehs that he was being instructed by Ratzlaff to leave because of his paper he was holding. Ex. 1, ¶43

44. But Ratzlaff did not tell Michael Eravi that he had to leave. The police officer said he would write a report to be sent to the city prosecutor. Ex. 1, ¶44

45. On November 26th, 2024, Dr. Spiehs returned to the Library and displayed the same piece of paper that he held on November 25th. He also wore a shirt with the same message "Free Speech Died Here Ask Me How." Tristan Star and Library employee Josh Lyles confronted Dr. Spiehs and they told him to stop displaying the piece of paper else they would call the police to have Dr. Spiehs removed. Three Lawrence police officers arrived and confronted Dr. Spiehs about the piece of paper and instructed Dr. Spiehs to leave the Library. No one took any issue with Dr. Spiehs displaying the same message on his shirt. Ex. 1, ¶45

46. Dr. Spiehs was placed in the PITS database by Library employee Darin McQueen again (without Dr. Spiehs knowing that) and was given another suspension. Ex. 1, ¶46

47. On December 1, 2024, David Basten entered the Library carrying a paper displayed saying "This public library should be defunded for constitutional violations!" Ex. 1, ¶47 Basten was confronted by Tristan Star and told to leave. Basten remained in the Library. Ex. 1, ¶47 Dr. Spiehs entered the Library. Brad Allen called police. Unknown to Dr. Spiehs, he was again placed in the PITS database as a "perpetrator" for disregarding direction of staff. Ex. 1, ¶47 Dr. Spiehs entered the library carrying a blank piece of cardboard. According to the PITS database, Jon Ratzlaff didn't talk to Dr. Spiehs because he claimed "since we have twice told him that Free Speech Activities were not allowed, we declined to tell him a third time" and that he claimed Dr. Spiehs knew he "can't have a sign." Ex. 1, ¶47 The police were called by the library director Brad Allen and confronted Dr. Spiehs about his

blank cardboard. Allen attempted to have the officer charge Dr. Spiehs with harassment because of Dr. Spiehs' blank cardboard. The officers refused and left. Ex. 1, ¶47

48. On December 9, 2024, the library displayed transgender and LGBTQ pride flags inside the library. Ex. 1, ¶48. Dr. Spiehs entered the library that day and silently stood displaying a "Don't Tread on Me" flag. He was informed by the Library security guard Darin McQueen that Dr. Spiehs was not permitted to display his flag because it was considered "expressive conduct or speech" and "protesting". Ex. 1, ¶48. At the same time, Michael Eravi stood with a LGBTQ pride flag draped around his shoulders. McQueen stated that Mr. Eravi was not violating the free speech activities policy with his displayed flag because of how he was holding the flag compared to how Dr. Spiehs held his flag. Ex. 1, ¶48. McQueen put Dr. Spiehs into the PITS database as a perpetrator. Ex. 1, ¶48

49. On March 27, 2025, Dr. Spiehs attended a public event at the library carrying a message "This library uses LPD violence to stop free speech" written on cardboard. He entered the library with these messages displayed and he attended the entirety of the event without incident. Ex. 1, ¶49. When the event ended he exited the meeting room and asked Jon Ratzlaff if he was going to be placed on the PITS database again for having these messages inside the library. Ex. 1, ¶49. Ratzlaff falsely stated to Dr. Spiehs that he had not displayed the messages inside the library. Ex. 1, ¶49. Dr. Spiehs went back into the library and stood silently displaying his message again.

50. Ratzlaff followed Dr. Spiehs back into the Library and immediately confronted Dr. Spiehs stating Dr. Spiehs could not show the words on his cardboard and told him to leave the library. He stated if Dr. Spiehs did not leave he would call the police which he did. Ex. 1, ¶49.

51. Ratzlaff  told the police over the phone that Dr. Spiehs' library access had been suspended.  The police declined to enforce the Library's free speech activities policy and they did not physically arrive to the Library. Ex. 1, ¶49.

52. On March 31, 2025, Dr. Spiehs entered the Library to attend an event and carried a message "Trump is right: if you are born with a dick then you are not a chick." written on cardboard.  Ex. 1, ¶50.

53. Upon entering the Library he was immediately confronted by Library employee McQueen who told Dr. Spiehs (for the first time) that he had been banned for a week from the Library.  Ex. 1, ¶50.

54. McQueen told Dr. Spiehs that unless he left the Library immediately that he would call the police and that Dr. Spiehs would be banned from the library for an additional 90 days.  Ex. 1, ¶50.

55. Dr. Spiehs asked to speak his supervisor or to get a copy of this ban in writing. McQueen refused both requests and called the police. Ex. 1, ¶50.

56. Lawrence Police arrived and allowed Dr. Spiehs to remain in the Library while holding his cardboard with those words written on it. Ex. 1, ¶50.

57. A few minutes later Brad Allen confronted Dr. Spiehs in the Library and declared that Dr. Spiehs was banned from the library for 90 days. Ex. 1, ¶50.

58. Dr. Spiehs was placed into the Library PITS database again. Ex. 1, ¶50.

59. When the Library was asked in Interrogatory 7 to identify the specific language in the Speech Activities Policy that Dr. Spiehs violated in Incident 217 on November 25, 2024, it did not provide any specific language that Dr. Spiehs violated but instead merely referred to the "Free Speech Activities Policy previously produced." Ex. 3.

60. The videos of the June and May events described in this memorandum is included as Exhibit 4 and as stipulated in the Pretrial Order. Ex. 4. (Plaintiff will file a motion to submit a motion to file those conventionally).

61. Dr. Spiehs intends to return to the Library communicating in the same manner. Ex. 1, ¶51.

### STANDARD

The Court is familiar with the summary judgment standard. The Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party.  *See SPIEHS V. LARSEN,* NO. **5:23-CV-4107-JAR-BGS, 2025** WL **721946** AT **\*1 (D. KAN. MAR. 6, 2025)**.

### PRETRIAL ORDER

Plaintiff brings 1983 claims on Counts 1 – 5 regarding First Amendment and Equal protection claims against each of these named defendants.  ECF 107, p.11.

### ALL JUSTIFICATIONS THE LIBRARY MAY GIVE ARE PRETEXTUAL

The justifications for the punitive actions against Dr. Spiehs vary from Library employee to employee.  When the plaintiff asked the Library to show exactly what language of any policy was violated, the Library refused to cite to any actual prohibition that was violated.  See Ex. 3.  So the Library deliberately laid in the

weeds. When the Policy speech restrictions are examined, there is no free-wheeling prohibition (nor could such ever be justified) empowering government employees to stop protected speech merely because they say so ("disregarding the reasonable direction of staff"). And this Court is not required to take a defendant's word as to why each did what he did. That purported policy of "disobedience" is made up and is not contained in the Policies. In its coming opposition to this motion, it is more than likely that the defendants will conjure up *post hac* reasons. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." *KENNEDY V. BREMERTON SCH. DIST.,* **597 U.S. 507, 543 N.8 (2022)**. Justification for such interference must also be communicated to the affected person. *See ID.* ("But [defendant] never raised concerns along these lines in its contemporaneous correspondence with [plaintiff]"). A court may not favorably impute motives or reasons to the defendants.

### THE LIBRARY IS ATTEMPTING TO CREATE A NO SPEECH ZONE

In Exhibit 2, this Lawrence Library has erected every imaginable prohibition to free speech in this public forum with no guidelines or definitions:

| | |
|---|---|
| • holding or carrying signs<br>• protesting<br>• using expressive conduct or speech<br>• distributing literature<br>• acting as a public speaker<br>• promotion material<br>• no free speech activities inside the Library that interferes with study and enjoyment of visitors of the Library<br>• requesting signatures, donations or contributions | • obscene, threatening, harassing, or abusive language or gestures including abusive language and gestures directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics<br>• signs endorsing or opposing the election of any candidate for public office and endorsing or opposing the adoption of federal, state, or local legislation<br>• panhandling |

ECF 107, p.5.  Ex. 2 (Policies).

14

This no-free-speech zone simply "burn[s] the house to roast the pig." ***BUTLER V. MICHIGAN,* 352 U.S. 380, 383 (1957)**.   With its breathtaking array of speech prohibitions and secret punishments the Library is literally attempting to replicate the infamous but unconstitutional "First Amendment Free Zone" as was enacted at the Los Angeles International Airport. *See **BOARD OF AIRPORT COMM'RS OF CITY OF LOS ANGELES V. JEWS FOR JESUS, INC.,* 482 U.S. 569, 571 (1987)** (striking down resolution declaring that a city's airport terminal was "not open for First Amendment activities"); ***CITY OF HOUSTON V. HILL,* 482 U.S. 451, 472 (1987)** (striking down ordinance allowing police to arbitrarily arrest, and thus stop from speaking, anyone who "annoyed" them).   Brad Allen does not have inherent dominion over this public venue to protect himself from criticism in declaring the "First Amendment has no power here" at this public library.

What were Dr. Spiehs' mortal sins?  Well, it depends as each library employee gave different reasons for punishing Dr. Spiehs.  But nothing that Dr. Spiehs did had anything to do with a safety concern – rather simply holding a paper or cardboard containing protected speech.  This case involves the repeated evictions or attempts to evict Dr. Spiehs from the Library because of his speech.  Dr. Spiehs was in no way a threat to safety.  Dr. Spiehs was not a sex offender, shoeless or vagrant who menaced library staff or whose "odor was so offensive that it prevent the library patrons from using certain areas of the library." *See **DOE V. CITY OF ALBUQUERQUE,* 667 F.3D 1111, 1115 (10TH CIR. 2012)** (sex offenders); ***NEINAST V. BD. OF TR. OF THE COLUMBUS METRO. LIBR.,* 346 F.3D 585, 589 (6TH CIR. 2003)** (shoeless man); ***KREIMER V. BUREAU***

*OF POLICE FOR TOWN OF MORRISTOWN,* 958 F.2D 1242, 1247-48 (3D CIR. 1992) (menacing, odiferous vagrant). Rather, all that Dr. Spiehs purportedly did, according to these Library employees, was to apparently violate the "acting as a public speaker," "protest," or "sign" prohibitions – whatever any of that means. And showing just how vague and overbroad that prohibition is, even a blank piece of cardboard was defined by these Library employees as prohibited. Pick anything from the list. Even if a sign, protest, or "acting" as a public speaker could be defined, there is no rational behind it to prohibit a message on a paper while permitting the same message on a shirt or hat. There is no compelling state interest and these "sign" or "protest" prohibitions are not narrowly tailored.

As the facts demonstrate, the Library vests complete unbridled discretion in Library employees to determine whether and how individuals in the Library (except for Library employees) may engage in free speech protected activities in this public forum.

### LIBRARY IS A DESIGNATED PUBLIC FORUM REQUIRING STRICT SCRUTINY AND NARROW TAILORING

The Library erroneously declares *ipso facto* that it is a "limited public forum" and that it will not "permit free speech activities inside the Library" if it "interferes with study and enjoyment of visitors of the Library." ECF 107, p.5. Ex. 2, p.1. It then erects another false premise by making a distinction without a difference – that "speakers are permitted to engage in free speech activities outside of the Library in the public right-of-way." *ID.* But the inside of the Library is every bit as much a public forum as the sidewalk outside the Library.

16

Based on those erroneous declarations, the Library enacted its Free Speech Dead Zone. The Library has the First Amendment upside down. A public library has long be recognized in this Circuit as a designated public forum. ***DOE V. CITY OF ALBUQUERQUE,* AT 1130** (libraries are open "to the public to engage in myriad ways to receive information," allow "general access to the public, without any need for pre-approval" and are intended to "provide a forum for all of the City's residents to engage in the receipt of information") ***ID.* AT 1129-30**. The "First Amendment right to receive information includes the right to some level of access to a public library." ***ID.* AT 1120** n.6.  Dr. Spiehs is a citizen journalist publishing stories and his observations and opinions.[1] This Library bears the burden of proving that all of its  speech restrictions are constitutional facially and as applied to Dr. Spiehs.  ***ID.* AT 30**.

The speech rules the Library has enacted and enforced against Dr. Spiehs are therefore subject to a content-neutral time, place, and manner restrictions *Doe* at 1128-31.  Those restrictions must (a) serve a significant governmental interest, (b) narrowly tailored to advance that interest, and (c) leave open ample alternative channels for the exercise of the constitutional right at issue. ***ID.* AT 1130-31**.  And, only after providing appropriate due process may a library can bar someone from accessing the library when such restrictions are violated.  To all of that the Library fails on every level.

---

[1] *See **BERGE V. SCHOOL COMMITTEE OF GLOUCESTER, 1**07 F. 4TH 33, FN.2 (1ST CIR. 2024)*("a citizen-journalist is like an unpaid freelancer who uses digital media to report on newsworthy events"); ***BUSTILLOS V. CITY OF ARTESIA,* 591 F. SUPP. 3D 1051, 1064 (D.N.M. MAR. 17, 2022)** ("News-gathering protections of the First Amendment do not turn on professional credentials or status").

PLAINTIFF'S FIRST AMENDMENT RIGHTS ARE VIOLATED

Why was Dr. Spiehs' speech stopped?  No one really knows other than he was told to stop.  The Library Policies prohibits "signs" and "protesting" – whatever they each encompass.  And one could say Dr. Spiehs was protesting by his speech and conduct.  But one thing is for sure, demonstrating is First Amendment protected. *See SHUTTLESWORTH V. CITY OF BIRMINGHAM*, 394 U.S. 147, 152 (1969) (describing privilege of citizens to assemble, parade, and discuss public questions in streets and parks). Content-based regulations must fit "a compelling interest and …narrow[] tailor[ing] to achieve that interest." *REED V. TOWN OF GILBERT,* 576 U.S. 155 (2015). Narrow tailoring requires the restriction to be "the least restrictive means among available, effective alternatives." *ASHCROFT V. AM. CIVIL LIBERTIES UNION*, 542 U.S. 656, 666 (2004). Defendants' actions miserably fail this test.

There is no compelling interest in restricting the media of a message or the content of protected speech in this public venue.  There is no compelling interest in restricting a citizen from publicly and peacefully demonstrating or protesting against the unconstitutional policies of this Library – whether the message is written on cardboard, paper, or a shirt.  Dr. Spiehs did nothing arising to "serious evil" justifying the restrictions and punishments imposed and enforced by each of these defendants. The audience is the Library management and individuals within the Library.  The relationship between public presence and "expressive conduct is intimate and profound." *HODGKINS EX REL. HODGKINS V. PETERSON*, 355 F.3D 1048, 1059 (7TH CIR. 2004).  Like a sidewalk protest, what Dr. Spiehs did is "commonly associated with

18

more particularized dissent. A sidewalk demonstration is often linked to a specific business or institution, focusing attention on what is occurring at that moment at that place." ***SULLIVAN V. CITY OF AUGUSTA*, 511 F.3D 16, 53 (1ST CIR. 2007)**.  If Dr. Spiehs is relegated to his speech 200+ feet away outside the Library, Dr. Spiehs cannot focus attention on what is occurring at this public library. And content-based restrictions on political speech in a public forum are subject to "exacting," or strict, scrutiny. ***MINN. VOTERS ALL. V. MANSKY*, 585 U.S. 1, 11 (2018)**.

The Library displayed its flags with messages and Dr. Spiehs displayed his flag.  Curiously, there is no "flag" prohibition in the Policies yet a Library employee deemed that media and message banned.  Then, merely displaying a flag or holding a 8 ½ x 11 paper – blank or with words written on it –  means citizens are off to jail if they walk through the library entry or hallway silently displaying any of those.  Of course that depends as Mr. Eravi displayed his paper with words of the policy and displayed a flag the Library employee approved.  This strict-liability no-speech zone is wildly unconstitutional.

### THE POLICIES AND THEIR ENFORCEMENT ARE A PRIOR RESTRAINT

The Lawrence public library's no-speech regime is an unconstitutional prior restraint. In addition to being content based, it lacks "narrow, objective, and definite standards," it requires the "appraisal of facts, the exercise of judgment, and the formation of an opinion," ***FORSYTH CNTY., GA. V. NATIONALIST MOVEMENT*, 505 U.S. 123, 131 (1992)**.  But what is "acting" like a public speaker, or "protesting" or how is a "sign" defined?  The Library gives zero guidelines to any Library employee in

making its PITS database / trespassing tickets.  Whether Dr. Spiehs violated any of the enumerated speech restrictions requires the exercise of judgment and the formation of an opinion.  Even the employees themselves are inconsistent in what underlying violation occurs.

A "prior restraint freezes speech before the audience has the opportunity to hear the message."  *IN RE PROVIDENCE JOURNAL*, **820 F.2D 1342, 1346 (1ST CIR. 1986)**; *TAYLOR V. ROSWELL INDEP. SCH. DIST.,* **713 F.3D 25, 42 (10TH CIR. 2013)** (prior restraint "carries a presumption of unconstitutionality").  Not only did each defendant tell Dr. Spiehs to stop his speech, they called police to enforce it. A criminal referral can function as a prior restraint.  *TAYLOR* **AT 42.**  While the Policies don't preclude Dr. Spiehs's speech in every public venue they stop it from reaching its intended audience in this public venue: the news media, Library personnel, and those within the Library.  A prior restraint impinges upon the right of the public to speak, and forbids pure speech, not speech connected to any conduct, "the presumption of unconstitutionality is virtually insurmountable." *PROVIDENCE* **AT 1348**.  The no-speech zone shuts down speech in advance of any disturbance or any problems.

## DUE PROCESS WAS DENIED

The plaintiff has requested "declaratory relief consistent with the injunction, to the effect that the Library Behavior Code with its speech prohibitions described above are unconstitutionally void and unenforceable as they violate the First Amendment rights of free speech and petition, and the Fourteenth Amendment's guarantee of due process against vague laws." ECF 107, p.15.

Few analyses of First Amendment violations need to start with "what authority did the censor have at all?" This one does. The way the Policies read and the way they have been applied is akin to giving these Library employees a general warrant that leaves "to the discretion of the executing officials the decision as to which persons should be arrested," an affront to the Fourth Amendment. *STEAGALD V.UNITED STATES,* 451 U.S. 204, 220 (1981).

The PITS database functions similar to an employee or student disciplinary record. It has the tainted characteristics of being recorded in a sex offender registry. These unilateral determinations of adverse disciplinary marks accumulate each time as Dr. Spiehs is labeled time and again as a "perpetrator." What began as no suspensions for speech has now escalated to a 90 day ban for the same speech. A ban from this public property and public forum denies Dr. Spiehs First Amendment liberties. *See SCHMIDT V HUFF,* NO. 25-CV-2081-EFM-GEB 2025 WL 901335 (KAN.D. 3/25/2025). In *SCHMIDT*, the parent Schmidt was banned from school property. Judge Melgren held that the ban was unconstitutional. *ID.* AT *4.

Nothing in the Policies or the way it was applied contained any procedures to provide notice or contest the adverse consequences except the Bulletin Board policy. Ex. 2, p.8 ( "Patrons may appeal and challenge the decline or removal of their content by contacting the Library Executive Director and/or Deputy Director"). The Library only heard from the Library employee and not Dr. Spiehs. It is an affront to due process that a Library employee can deprive any citizen including Dr. Spiehs of their First Amendment rights with no opportunity to be heard. *See MATHEWS V. ELDRIDGE,*

424 U.S. 319, 335 (1976). These employees had no authority to put Dr. Spiehs on its "naughty list" and then declare no trespass. They actually cite no actual violations of any policy speech restriction or any law or rule that they arbitrarily determined that Dr. Spiehs' speech warranted a prior restraint, measured against no regulation with no *mens rea*.

Being a designated public forum "the government's right to restrict expressive activity is sharply circumscribed and must satisfy strict scrutiny." *SPIEHS V. LARSEN*, NO. 5:23-CV-4107-JAR-BGS, 2025 WL 721946 AT *4 (D. KAN. MAR. 6, 2025). The Library has set up a Star Chamber kind of disciplinary system in which, unknown to Dr. Spiehs, he has no notice of the discipline of being placed in the PITS database, being banned or trespassed ("suspended"), or having any way of appealing these adverse consequences. SOF ¶34, 41,47 (describing being banned without knowledge). Whether procedural due process is implicated in state action depends upon a showing that (1) there exists a protected life, liberty, or property interest at stake, and (2) that sufficient process was not provided to protect that interest. *KRENTZ V. ROBERTSON*, 228 F.3D 897, 902 (8TH CIR. 2000). Process usually comes in the form of notice and an appropriate opportunity to be heard. *JONES V. FLOWERS*, 547 U.S. 220, 223 (2006).

Given that Dr. Spiehs had a protected liberty interest in his free speech right to access the Library as a designated public forum, "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *WILKINSON V. AUSTIN,* 545 U.S. 209, 226 (2005). In this case Dr. Spiehs was never notified of his bans until they expired or afterwards. Dr. Spiehs

would not know to appeal if such a process was provided for by the Library. Dr. Spiehs presented no safety threat to anyone and as such a pre-deprivation hearing was required. And given the fact that Library employees were empowered to unilaterally place Dr. Spiehs in the PITS database and mete out consequences, this "policy increases the risk of retaliatory or ad hoc deprivation." *VOLLMECKE V. INDEPENDENCE SCHOOL DISTRICT V. INDEPENDENCE SCHOOL DISTRICT,* CASE NO. **23-00644, 2023** WL **4524547** AT **\*11** (**W.D. MO. OCTOBER 11, 2024**) (finding due process violated in restricting speech in limited public forum resulting from ban from school property).

The Policies and this disobey-the-employee vagueness further evidences a deprivation of due process. Disobeying an employee cannot be the ultimate violation or is it? *See* Ex. 2. p. 2 ("If a speaker is in *violation of the Policy*, library staff must"). The Library must follow its own rules. What was the underlying violation? Those Policies and the employee orders, like any regulation, must define the offense with sufficient definiteness so ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *KOLENDER V. LAWSON*, **461** U.S. **352, 357 (1983)**. A great degree of specificity and clarity of such notice and restriction is required when First Amendment rights are at stake. *GAMMOH V. CITY OF LA HABRA*, **395** F.3D **1114, 1119 (9TH CIR. 2005)**.

### POLICIES ARE NOT CLEAR, NOT CONTENT NEUTRAL, AND ARE NOT RATIONAL

Plaintiff has brought facial and as-applied claims. ECF 107, p.11 (Counts 1 & 2). First Amendment challenges to government policy can be facial and as-applied. *COLO. RIGHT TO LIFE COMM. V. COFFMAN*, **498** F.3D **1137, 1146 (10TH CIR. 2007)**. *See CATHOLIC LEADERSHIP COAL. OF TEX. V. REISMAN,* **764** F.3D **409, 426 (5TH CIR. 2014)**

(the "precise boundaries of facial and as-applied challenges are somewhat elusive – certain challenges can have characteristics of both").

This Court must first determine whether Dr. Spiehs' engaged in protected speech, then "identify the nature of the forum, because the extent to which the [defendant] may limit access depends on whether the forum is public or nonpublic," and third, determine "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *CORNELIUS V. NAACP LEGAL DEF. & EDUC. FUND, INC.,* **473 U.S. 788, 797 (1985)**. The first two steps are answered: Dr. Spiehs' speech was protected speech and the Library is a designated public forum. *See GILMORE V. BEVERIDGE,* **2022 WL 3139023, AT \*5 (D. KAN. AUG. 5, 2022)** (there "is no meaningful dispute that Plaintiff's statements to the school board are protected speech"); *MILLER V. GOGGIN*, **672 F. SUPP. 3D 14, 46 (E.D. PA. 2023)** ("Plaintiff's criticism of the school board . . . is undoubtedly protected by the First Amendment"); *CITY OF LADUE V. GILLEO,* **512 U.S. 43, 48 (1994)** ("Signs are a form of expression protected by the Free Speech Clause").

Nothing in the Policies defines any term. The Library provides no "examples of guidance or other interpretive tools" to assist a Library employee in the interpretation of "sign," "protest," or for that matter any of the other terms. *MARSHALL V. AMUSO,* **571 F. SUPP. 3D 412, 424-426 (E.D. PA. 2021)** ("irreparably clothed in subjectivity"). Any "indeterminate prohibition carries with it the opportunity for abuse," particularly when that prohibition "has received a virtually open-ended interpretation." *MINN. VOTERS ALL.* AT **21** (quoting *BD. OF AIRPORT*

*COMM'RS OF L.A. V. JEWS FOR JESUS*). Under *MANSKY* the Library's policy is unreasonable because it "fails to define key terms, lacks any official guidance, and vests too much discretion in those charged with its application." *YOUNG ISRAEL OF TAMPA, INC. V. HILLSBOROUGH AREA REG'L TRANSIT AUTH.*, 89 F.4TH 1337, 1347 (11TH CIR. 2024). At the very least, the Library "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out," which arbitrarily depends on which employee is on duty enforcing the Policies. *See MANSKY, 585 U.S. AT 16*. A "grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional." *ATLANTA J. & CONST. V. CITY OF ATLANTA DEP'T OF AVIATION*, 322 F.3D 1298, 1310 (11TH CIR. 2003).

All of the speech and conduct prohibitions contained in the Policies are vague, unconstitutional regulations. What is a "protest" or a "sign"? Is "sign" defined the same way as the Merriam municipal code Chapter 53 defines it as an "attention-attracting device"? Maybe it includes holding a blank piece of paper. Or displaying a flag. But not a message written on the media of clothing. Some flags with messaging are OK while others with different messaging are not according to the Library.

Library employee Marc Veloz admitted the message criteria was not content neutral because he told Dr. Spiehs his particular message "made other individuals feel uncomfortable." (Plaintiff Statement of Fact) SOF ¶18. Employee Tristan Star erroneously claimed the Library wasn't a "public library" SOF ¶24. The Library is

not private property. Trespass law works differently at the Library than it does on private property, where a person can be excluded for any or no reason at all. The Library had and continues with its custom of applying private property trespassing law to justify no trespassing bans upon Dr. Spiehs and having him threatened with arrest at the library. Star then admitted, like Veloz, that he wasn't allowing Dr. Spiehs' messaging which he claimed made "people feel uncomfortable." SOF ¶24. When Dr. Spiehs displayed his Don't Tread on Me flag at the Library, it was banned while other flags with different messages were permitted.

The speech policy is like the Bulletin Board policy (Ex, 2, p.7): it requires that one must read the content – missing persons or pets, endorsing or opposing candidates or adoption of legislation, or making "personal attacks" (as opposed to saying nice things about the same person) and even messages that purportedly "targets or disparages" *i.e.* anything negative about "sexual orientation." Thus, like the flags promoting LGBTQ a message not positive about that – including any citations to the Old or New Testament – are prohibited. All of which is viewpoint discrimination.

These named defendants all were required to look at the content of Dr. Spiehs, paper, cardboard, and flag. That is content-based. *See* **SURVIVORS NETWORK OF THOSE ABUSED BY PRIESTS, INC. V. JOYCE,** 779 F.3D 785, 789 (8TH CIR. 2015) (statute that banned disruption of a house of worship "by using profane discourse, rude or indecent behavior" but did not define those adjectives was content based because enforcement authorities would have to decide whether the speaker was using such

language or behavior in disrupting a house of worship); *NEIGHBORHOOD ENTER., INC. V. CITY OF ST. LOUIS,* **644 F.3D 728, 736 (8TH CIR. 2011)**("zoning code's definition of 'sign' is impermissibly content-based because the message conveyed determines whether the speech is subject to the restriction").

And nothing in this lawsuit indicates the Library has any safety interest in distracting drivers. Regulation can occur when signs "pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *ID.* There are no set of interests that the Library could possibly manipulate to fit that criteria in that public venue.

For all the Court knows, a "sign" prohibition could include flags, artwork, posters, flyers, book covers, or even the screen to a laptop or iPad. This Policy regime, facially and as applied, is content based because, as the facts demonstrate, Library employees have to read the sign or look at the paper or flag's content to determine whether its restrictions apply. *REED*, **576 U.S. AT 162**; *CLARK V. CITY OF WILLIAMSBURG, KAN.,* **388 F. SUPP. 3D 1346, 1358 (D. KAN. 2019)**, *AFF'D*, **844 F. APP'X 4 (10TH CIR. 2021)**; *QUINLY V. CITY OF PRAIRIE VILL., KAN.,* **446 F. SUPP. 2D 1233, 1239 (D. KAN. 2006)**; *NORTON V. CITY OF SPRINGFIELD, ILL.*, **806 F.3D 411, 412 (7TH CIR. 2015)**; *NEIGHBORHOOD ENTERPRISES, INC.* **AT 736**. Library employees will not be able to explain why displaying a message on clothing is not a sign while the same message displayed on a 8 ½ x 11 typing paper is. Does the sign or protest prohibition include

27

displaying a message on a yellow post it note?  Apparently it can depending on the employee.  Or why one flag is a sign and another is not.  The Library does not treat all messages the same and does not treat all "signs" the same.  Even if it did, it's still a "content-based" regulation because it's a "regulation targeted at specific subject matter" "even if it does not discriminate among viewpoints within that subject matter." *REED*, 576 U.S. AT 169.  So Dr. Spiehs can convey the exact same message on his shirt but not on paper or cardboard.  Mr. Eravi and the Library can display their flags but Dr. Spiehs cannot display his. That "favor[s] some speakers over others" and "reflects a content preference." *REED,* 567 U.S. AT 170.  "Both on its face and in its practical operation," this public Library's speech policy regime "imposes a burden based on the content of speech and the identity of the speaker," *SORRELL V. IMS HEALTH INC.,* 564 U.S. 552, 567 (2011), and is "a paradigmatic example of content-based discrimination," *REED*, 576 U.S. AT 169.

Government regulations which rely on a viewer's subjective interpretation of facts are void for vagueness. *CITY OF CHICAGO V. MORALES*, 527 U.S. 41, 56-64 (1999) (holding a provision criminalizing loitering, which is defined as "to remain in any one place with no apparent purpose," void for vagueness because the provision was "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene"); *TUCSON WOMAN'S CLINIC V. EDEN*, 379 F.3D 531, 554-55 (9TH CIR. 2004) (holding a statute requiring physicians to treat patients "with consideration, respect, and full recognition of the patient's dignity and

individuality" void for vagueness because it "subjected physicians to sanctions based not on their own objective behavior, but on the subjective viewpoint of others").

### STRICT SCRUTINY APPLIES, WHICH DEFENDANTS CANNOT SATISFY

A "designated public forum is treated the same as a traditional public forum when assessing the government's ability to restrict speech." *SESSLER V. CITY OF DAVENPORT*, 102 F.4TH 876, 882 (8TH CIR. 2024); *PLEASANT GROVE CITY V. SUMMUM,* 555 U.S. 460, 469 (2009) ("subject to the same strict scrutiny as restrictions in a traditional public forum"). Content-based regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *REED*, 576 U.S. AT 163. That requires the Library to prove, with evidence, its prohibitions on protected speech actually advance its stated interests, that its restrictions are not over- or under-inclusive, and that it used the least restrictive means possible. *See generally ID.* AT 171–72 (underinclusive); *UNITED STATES V. WILLIAMS*, 553 U.S. 285, 292-97 (2008) (overbroad); *UNITED STATES V. PLAYBOY ENT. GRP., INC.,* 529 U.S. 803, 827 (2000) (least restrictive means required to address a real problem).

The Library can't reach even its initial First Amendment mile marker.  To satisfy strict scrutiny, defendants must first "specifically identify an actual problem in need of solving." *BROWN V. ENT. MERCHANTS ASS'N,* 564 U.S. 786, 799 (2011). One of the most glaring loopholes in the Policy is the wholesale exemption from its prohibitions by a "sponsor."  The Library says that a sponsor is someone who reserves space in the library. Ex. 2, p.1.  But then provides that all of its prohibitions do not

apply to the sponsor ("This policy does not apply to sponsors…").  The policy does not limit the sponsor's speech anywhere in the Library once qualified as a sponsor.  Why do individuals who pay the Library money entitled to greater speech rights than other individuals?

The Library's no-speech-zone takes on many attacks to the First Amendment. Consider the prohibition of being banned from "requesting signatures/donations/contributions." Ex. 2, p.1.  So no one can get or give a signature to a letter or legal document?  No one can give or receive an autograph?  One cannot ask her mother for money to get a drink from the vending machine? And the mother cannot "donate" that money to her child?  "Acting" as a "public speaker" means what? This means that an individual cannot present speech to a group of individuals at a table or arrangement of chairs?  Does this prohibit evangelism or the sharing of any information to strangers?   These restrictions are hopelessly vague and wildly overbroad.   Then the Library treats "signs" differently depending on where they appear in the Library.   It states in its Bulletin Board Policy that "Acceptable Materials" on its Board can be no larger than 11"x17" but that "smaller posters and flyers are accepted and encouraged."  Why wasn't Dr. Spiehs' paper and cardboard considered a "poster"?  And isn't a "poster" and "flyer" simply a pseudonym or even subdivision of what a "sign" is? So the Library permits signs on its Board but not anywhere else – what is the justification for that?

"Interfering" with study and enjoyment of any individual in the Library is prohibited.  This is a heckler's veto, vague, and overbroad.  This is beyond a safety

concern going into any innocuous speech or behavior.  And who would know what purportedly "interferes" with "enjoyment" or "study."  This prohibition has no definitions and no workable standards to guide arbitrary enforcement.

"Distributing literature" is banned.  Literature includes library books.  For that matter, literature could include anything written.  So one cannot pass notes in the Library?  One cannot pass a library book to another person?  This is wildly vague and overinclusive.  "Literature" is literally anything written.  What is the rational prohibiting this kind of speech in writing when other written speech can be "distributed" or when the same speech can be communicated orally?  But then the Billboard Policy permits "literature" to be distributed on its Board. What is the rational?

"Panhandling" is banned.   That is overinclusive and underinclusive. Panhandling involves only one type of request: money.   But there are other solicitation activities such as being asked for one's opinion in response to a poll.  Or being solicited to volunteer or attend an event. *See* **REED** AT **2232** ("In light of this underinclusiveness, the Town has not met its burden to prove that its Sign Code is narrowly tailored to further a compelling government interest").  And it is overinclusive as it prohibits the solicitation of money by a child to his mother or sibling, or from a friend to a friend.

Since the Supreme Court's ruling in **VILL. OF SCHAUMBERG V. CITIZENS FOR A BETTER ENV'T,** 444 U.S. 620, 632 (1980) ("charitable appeals for funds, on the street … are within the protection of the First Amendment"), it is beyond dispute that

begging is speech protected by the First Amendment. And since the Supreme Court's ruling in ***REED V. TOWN OF GILBERT,*** it is beyond dispute that anti-panhandling laws, like the Library prohibition, which regulate speech based on content and in a traditional public forum, must satisfy strict-scrutiny review. The ***REED*** decision confirmed anti-panhandling laws are presumptively unconstitutional. ***BROWNE V. CITY OF GRAND JUNCTION, COLO.,*** **136 F. SUPP. 3D 1276, 1288 (D. COLO. 2015)**; ***MESSINA V. CITY OF FORT LAUDERDALE, FLA.,*** **546 F. SUPP. 3D 1227, 1237 (S.D. FLA. 2021)**.

Every reason provided in the PITS database for banning Dr. Spiehs is vague and arbitrary. PITS stated "disregarding the reasonable direction of staff" but stated no underlying violation of any policy. SOF ¶41, 47. But simply because a Library employee makes a command does not vacate the First Amendment. Simply carrying a blank piece of paper violated the Library's "sign" prohibition which is absurd both as to the meaning of "sign" and as applied to a blank paper. And the idea that the same message would be banned because of the medium used (paper) versus a shirt or even saying it verbally is also absurd. SOF ¶45 (same message on shirt). What is the rational in banning messages because they are expressed on a "sign" versus allowing the same message because it is spoken or written on a hat or a shirt? Then the Library prohibits "protesting" which is intrinsically viewpoint based. If Dr. Spiehs had displayed a message saying "More Power to Drag Queens" that would not be considered a protest. But displaying a negative about "Drag Queens" falls under the "protest" ban which is viewpoint discrimination.

But whatever reasons the Library will come up in response to this Motion could possibly be compelling, these defendants can't satisfy less rigorous tests below which necessarily means this public Library can't satisfy the heavier one.

### THE LIBRARY'S RESTRICTIONS AS WRITTEN AND AS APPLIED CAN'T SURVIVE ANY FORM OF HEIGHTENED SCRUTINY

The Plaintiff Dr. Spiehs is still entitled to summary judgment even if strict scrutiny doesn't apply. The Library will not have any evidence that its restrictions on speech advance its stated overarching interest to have a no-free-speech zone within the library deeming Dr. Spiehs as a mere "visitor" on this public forum (Ex. 2, p.1) and then not merely keeping "visitors free from disturbance" but the breathtaking prohibition of keeping visitors free from "free speech" of the unauthorized kind ("unauthorized free speech activities by others") – even if it does not "interfere with study and enjoyment of visitors of the Library."

Even under the Commercial speech test, this not a fact-free, government deferential inquiry. In *APTIVE ENVTL., LLC V. TOWN OF CASTLE ROCK, COLO.,* **959 F.3D 961 (10TH CIR. 2020)**, the Town of Castle Rock produced complaints involving registered and unregistered solicitors, solicitors visiting homes after the curfew time, testimonial evidence from council members, town employees, the police chief and its former mayor, statistical evidence, and much more. *ID.* AT **990-992**. That was not enough to satisfy the government's First Amendment burdens, the court held. *ID.* AT **996** (The town "has failed to demonstrate that the Curfew directly advances in a material way its substantial interest"). The regulation was not content-neutral because the "very basis for the regulation is the difference in content between

ordinary newspapers and commercial speech." *ID.* AT **982**. By analogy, the Library distinguishes both the media (as applied messages on clothing allowed but same messages not permitted if displayed on paper, cardboard, or a flag) and the content.

The Library policy itself operates under the false premise of claiming it is a limited public forum and therefore doesn't offer any compelling state interest in any of its speech prohibitions. There are no "harms" stated in the Policies that are "real and that its restriction will in fact alleviate them to a material degree" either. *APTIVE*, **959 F.3D AT 999**. The Court and this plaintiff will have to wait and see what interests the defendants will offer after the fact in its opposition to this motion.

The Bulletin Board Policy bans something called "out of service area" which apparently means speech is limited to "information particular to Lawrence, Kansas, and its surrounding Douglas County region." And with that no speech could occur that concerned national figures or issues – or topics or state officials as to the state of Kansas. There is no compelling state interest to limit speech in this public forum to that geographical area. One can post a "missing" notice if it concerns inanimate objects but not living organisms (although one could post a missing animal as long as it wasn't deemed one's "pet"). Then it plainly bans categories of pure political speech. It allows speech about candidates for public office but bans opinions about that public official as to his or her election. But other compliments or criticisms are permitted about the same individual. Legislation can be discussed but not if the information expresses an opinion one way or the other about it. Yet once passed the Library allows discussion as to that legislation. Messaging that "target" or "disparage"

categories of "ethnic, racial, age, gender, religion, sexual orientation, or disability status" is content based and viewpoint discriminatory. Whether it "targets" or "disparages" is in the eye of the beholder. There is no compelling state interest in banning those categories of protected speech.

### EVEN IF IT'S CONTENT NEUTRAL, THE SPEECH REGIME IS UNCONSTITUTIONAL

Even if the regime is content neutral, the Tenth Circuit's fact-intensive content-neutral test proves too much for this Lawrence public library as well. *See MCCRAW V. CITY OF OKLAHOMA CITY,* 973 F.3D 1057, 1071-1072 (10TH CIR. 2020) (describing and applying content-neutral test). In *BREWER V. CITY OF ALBUQUERQUE,* 18 F.4TH 1205, 1209 (10TH CIR. 2021) the city of Albuquerque restricted pedestrian activities touting a theory that it "was necessary to address persistent and troubling pedestrian safety concerns stemming from high rates of vehicular accidents." The "burden falls on the City to show that its recited harms specifically defined, are real and that the Ordinance will in fact alleviate them in a direct and material way—and if the City is unable to demonstrate that the Ordinance provides more than ineffective or remote support for the City's stated purpose, or sufficiently serves those public interests in a direct and effective *i.e.*, material way, then we are constrained to conclude that the Ordinance is not narrowly tailored and, consequently, contravenes the First Amendment." *BREWER,* 18 F.4TH AT 1227. *BREWER* held because "as the record evidence reflects, the Ordinance neither alleviates any real, non-speculative harms in a direct and material (*i.e.*, effective) way, nor otherwise advances the City's more abstract safety rationales." *ID.* AT 1226. Even under a content neutral

framework, the government needs concrete evidence justifying its First Amendment restrictions. *BREWER* **AT 1226** (First Amendment violation "unmistakable" when "juxtaposed against the paltry record evidence of real, non-speculative harms"); *ID.* **AT 1238** (describing "paucity of evidence proffered by the City"); *ID.* **AT 1243** (government "required" to have "evidence demonstrating" the ordinance "ameliorates real, not speculative, harms"); *ID..* **AT 1245** (City's "largely evidence-free approach" to establishing the ordinance's constitutionality "an approach that is unavailing – is emblematic of its efforts, more broadly, to demonstrate the Ordinance's constitutionality – efforts that are also unavailing").

The language is unconstitutionally overbroad. It is impossible to determine whether a [policy] reaches too far without first knowing what the [policy] covers." *UNITED STATES V. WILLIAMS*, **553 U.S. 285, 293 (2008)**. The second step is to examine whether this policy language penalizes a substantial amount of expressive conduct. *ID.* **AT 292**. Finally, this Court asks "whether the statute is readily susceptible to a limiting construction which would render it constitutional." *ID.* All of the Library's expansive speech prohibitions "applies to a substantial amount of expressive conduct." *WILLSON V. CITY OF BEL-NOR, MO.,* **924 F.3D 995, 999 (8TH CIR. 2019)** (ordinance creates a "prohibition of alarming breadth." *ID.* **AT 1003**. The Library Policies are not readily susceptible to a limiting construction because they would have to be rewritten in order to conform to constitutional requirements. *WILLSON* **AT 1004**. Courts do not rewrite laws in these circumstances, as this would invade the "legislative domain." *ID.* And as briefed above, to determine whether a "poster" or a

"flyer" is a "sign" requires the Library employee to analyze its content. "These definitions [in the Ordinance] show that the content of a flag or sign determines whether it is a flag or sign." *ID.* AT **1000**.

RETALIATION

In ***SPIEHS V. LARSEN*, 728 F. SUPP. 3D 1190, 1213 (D. KAN. 2024)**, this Court recognized that law enforcement officers removing speaker from public meeting would chill person of ordinary because "the specter of law enforcement could chill speech … because speakers…fear arrest." The Library defendants successfully invoked police making Dr. Spiehs leave the Library until the Lawrence Police acknowledged through its refusal to conduct themselves as Brad Allen's bouncer in allowing Dr. Spiehs to remain with his messaging.

A First Amendment retaliation claim outside the employment context are: (a) he was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. ***VAN DEELEN V. JOHNSON*, 497 F.3D 1151, 1155-56 (10TH CIR. 2007)**. Dr. Spiehs has a clearly established right to publish on a topic of public interest as well as speak to policy inconsistencies, or even unethical or illegal practices of these defendants. The retaliatory actions they engaged in were: (1) stopping Dr. Spiehs speech; (2) threatening to call police; (3) calling police to have Dr. Spiehs forcibly removed or placed under arrest; (4) being placed into the PITS

database as a "perpetrator" meaning there is incremental accumulated punishment ranges, and (5) being banned from the Library for periods of time even though Dr. Spiehs speech and conduct did not pose any danger nor did it disrupt any operation of the Library.

**RETALIATION POLICY AND POLICY MAKER**

The Library made each defendant employee who put Dr. Spiehs into the PITS database with consequences their own on-the-spot policymaker as each would decide what the actual policy language was violated and how. These defendants improperly use police to intimidate and enforce this no-speech zone – a purported violation of which is not crime. This use of police is retaliatory.

The Library has caused – was the moving force – regarding a violation of a federal right by: (1) directing that the violation occur; (2)  authorizing the violation; (3) agreeing to a subordinate's decision to engage in the violation; or through acquiescence or ratification of each named defendant using its vague speech policy. *BRYSON V. CITY OF OKLA. CITY,* **627 F.3D 784, 788 (10TH CIR. 2010)**.  This policy is known by the Library and Brad Allen to be interpreted differently and enforced differently – particularly when there are no objective workable standards. These varying and inconsistent outcomes is an endemic problem traceable to the policy itself.  It is systemic.  When systemic, "municipal liability may exist without individual liability." *LUCAS V. TURN KEY HEALTH CLINICS, LLC,* **58 F.4TH 1127, 1144 (10TH CIR. 2023)**.

**EQUAL PROTECTION AND SELECTIVE ENFORCEMENT**

"Government cannot regulate speech by relabeling it as conduct." *OTTO V. CITY OF BOCA RATON*, **981 F.3D 854, 865 (11TH CIR. 2020)** (citing *TEXAS V. JOHNSON*, **491**

38

U.S. 397, 414 (1989)). The court must "give deference to [the] association's view of what would impair its expression." *BOY SCOUTS OF AM. V. DALE,* **530 U.S. 640, 653 (2000)**. Defendants treated Dr. Spiehs differently than others who were similarly situated in every material respect. *KANSAS PENN GAMING, LLC V. COLLINS,* **656 F.3D 1210, 1216 (10TH CIR. 2011)**. *See PALMORE V. CITY OF PAC.,* **851 F. SUPP. 2D 1162, 1170 (E.D. MO. 2010)** ("The Equal Protection Clause also prohibits the selective enforcement of the law based on `unjustifiable' factors"). David Basten entered on December 1, 2024, carrying a paper with a message, is confronted but no police are called. Dr. Spiehs enters minutes later carrying his paper and only then are the police called by Brad Allen. On December 9th Dr. Spiehs and Mr. Eravi carried their respective flags into the Library. Mr. Eravi used paper to display a message simultaneously as Dr. Spiehs did. Dr. Spiehs was sanctioned while Mr. Eravi was not. Dr. Spiehs was denied the "equal share of the rights, benefits, and privileges enjoyed by other citizens." There is no rationale to justify Dr. Spiehs' treatment of having his speech sanctioned and police called to arrest him when Basten and Eravi's similar speech of the same days at the Library were not. It was targeted selective retaliation and enforcement which violates Equal Protection. The Library cannot honestly contend that every person coming into the Library holding books, literature, paper that could be construed as "signs" are placed into the PITS database. This Library cannot have a legitimate interest in imposing a sanction on one group of people and not another when the "evil, as perceived by the State, is identical." **EISENSTADT V. BAIRD, 405 U.S. 438, 454 (1972)**. The PITS database operates like an employee or student record or even like a sex offender registration. Bad reports and bad disciplinary marks accumulate against Dr. Spiehs. What was a one day no

39

trespass for speech has now become 90 days.  These classifications imputed upon Dr. Spiehs in this PITS database accumulate like incremental bad grades justify, according to the Library, ever increasing consequences upon Dr. Spiehs for what it classifies as the same speech.  The relationship the Library connects to Dr. Spiehs' speech and its registration into the PITS database is so shallow as to render its distinctions wholly arbitrary.  *See* **CITY OF CLEBURNE, TEXAS V. CLEBURNE LIVING CTR., 473 U.S. 432, 446 (1985)**.  There is no rational basis to put Dr. Spiehs in this Library's "perpetrator" database and those records should be purged concerning what the Library repeatedly registers him as a perpetrator.

## Conclusion

The Court should grant Dr. Spiehs partial motion for summary judgment against Brad Allen, Kathleen Morgan, Tristan Star, Jon Ratzlaff, and the Public Library of the City of Lawrence, Kansas for all the reasons stated above.  The Court should declare its Policies unconstitutional facially and as applied to Dr. Spiehs, enjoin their enforcement, and rule in his favor as to the violation of his First Amendment rights.

Certificate of Service
    The above was provided notice to all parties entitled to such notice pursuant to the Court's electronic filing system.

/s/Linus L. Baker
Attorney for the plaintiff

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:            913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff