## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Justin Spiehs | Case No.   5:24-cv-04016-JAR-BGS |
| Plaintiff | |
| v. | PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Kathleen Morgan *et al* | |
| Defendants | |

**RESPONSE TO STATEMENT OF FACTS**

The plaintiff only responds to the defendants' numbered paragraphs in which he controverts the defendants' factual assertions.

**4.** **Plaintiff entered the Library on May 17 while holding a sign to protest with a sign that read something to the effect of "If You Have A Dick, You're Not A Chick," and he attempted to enter the auditorium with his sign.**

Objection: lack of foundation regarding an intent "to protest" and the word "protest" is vague and undefined.  Controverted to the extent the statement is without foundation or personal knowledge as to Dr. Spiehs' intent (to "protest"), and the phrase "something to the effect" as being vague. Dr. Spiehs entered the Library to communicate his message. It is controverted as Dr. Spiehs states in the video that he was present "to learn."  Dr. Spiehs motivation was to inform and educate Library staff and the public. **Ex. 1a ¶10** (Dr. Spiehs' Sworn Statement (nothing in the PITS database referenced Dr. Spiehs "interfering" or being "disruptive").

**6.** **Plaintiff and a person associated with the KLS event began to cause a disruption as the person informed Plaintiff he could not attend the event with the signs.**

Object as argumentative and a legal conclusion ("disruption").  Dr. Spiehs caused no disruption.  Controverted.  The unknown woman and the Library defendants were the ones who stopped Dr. Spiehs from entering the public event and then later demanded that he leave the Library building. *See* Plaintiff's Summary Judgment **Ex. 2 (video of May 17). Ex. 1a, ¶10** (nothing in the PITS database referenced Dr. Spiehs "interfering" or being "disruptive")

1

**8**. **The Library interpreted its Behavior Policy to not allow protesting inside the Library because protesting disturbs and disrupts others' use of the Library. Protesting was only allowed outside the Library.**

Controverted as argumentative ("Library interpreted"), lack of foundation as the Library's Board of Trustees is the entity authorized to create Library Policy, it is not supported by the citation, and the defendants' **Ex. 3** (Behavior Policy) does not contain the word "protest," or the location of any so-called "protesting," or any anti-protest language while its new policy does use the word "protesting." Controverted as the statements of Morgan and Allen are *post hac* rationales and not what was stated to Dr. Spiehs at the time of the occurrence. **Ex. 1a ¶10** (nothing in the PITS database referenced Dr. Spiehs "interfering" or being "disruptive")

**9**.**Library employees explained to Plaintiff that he could attend the meeting without his signs, but he could not protest with the signs inside the Library.**

Controverted as to "he could not protest with the signs" assertion as it is not supported from the video.  It is controverted as the dialogue from the video specifically stated Library staff said it was the words and message on Dr. Spiehs' sign.  What is actually stated is that the library employee said "*if* you intend to protest" and Dr. Spiehs' response was he was there to "learn."  Object as speculation as to Dr. Spiehs state of mind to constitute a "protest" which is speculative. **Ex. 1a ¶10** (nothing in the PITS database referenced Dr. Spiehs "interfering" or being "disruptive")

**11.** **The person associated with the KLS event then asked whether she could rent the auditorium to make the event private. Library staff discussed that they had a reservable room policy that allowed for private entities to rent the auditorium and determine whether the event would be public or private. Following these discussions, the person rented the auditorium.**

Controverted to the extent that the event was a public event when Dr. Spiehs was denied entry or told he could not carry his messages. **Ex. 1a ¶¶4-5** (explaining that it was Morgan and her Library staff who came up with the scheme that the event be converted to private after the fact by paying a fee to target Dr. Spiehs – but this occurred *after* Library staff had already prevented Dr. Spiehs from entering).

**13.Plaintiff left the Library following the discussion with the officer and protested outside the Library through the end of the video.**

Controverted as the video does not support the assertion that Dr. Spiehs "protested outside the Library" which is also speculative as to Dr. Spiehs' state of mind. **Ex. 4 (ECF 112-5)** (videos)

**20. After the event started, Plaintiff removed his signs from the purse and began displaying his signs, causing a disruption in the event.**

Controverted as the citation does not support the assertion, the "sign" did not cause anything – and it is further controverted as the video shows Dr. Spiehs sitting silently.  Plaintiff SJ Mot. **Ex 2 (ECF 112-5)** (video). **Ex. 1a ¶10** (nothing in the PITS database referenced Dr. Spiehs "interfering" or being "disruptive")

**21. Star requested Plaintiff and the other protesters to leave the program because they were causing a disruption, and plaintiff complied.**

Controverted as Star did not ask but demanded Dr. Spiehs leave, his opinion about "disruption" is a legal conclusion, and is controverted from Dr. Spiehs' statement and the video evidence. **Ex 2** (June 11 video) **Ex. 1a ¶10** (nothing in the PITS database referenced Dr. Spiehs "interfering" or being "disruptive")

**22. In May and June of 2023, the Library had in place an Exhibit and Display Policy that allowed members of the public to display signs and similar expressive displays on a first come, first serve basis.**

Controverted as the assertion that the Exhibit and Display Policy concerned "signs" is not supported from the citation – the Policy never mentions the word "sign."

**25. The Free Speech Activities Policy defined "Free speech activities" to include certain types of expressive conduct, including protesting, holding signs, and distributing literature.**

Controverted as argumentative "expressive conduct" vs "speech") as the Policy itself states "Free speech activities" include "expressive conduct or speech."

**27. The Library's Free Speech Activities Policy prohibits all forms of protesting within the Library and regardless of the content or the speaker's message.**

Controverted as a legal conclusion. If "protesting" means saying negative things about a person or a subject, the Policy is content based and viewpoint discriminatory as positive speech is not prohibited about the same subject matter.

**29.** **Staff are to document any incidents under the Free Speech Activities Policy in the Library's Patron Incident Tracking System.**

Controverted as the citation to the Policy does not support the assertion regarding "incidents." The Policy states that a "violation" is to be documented in the tracking system.

\* The heading "**Plaintiff's Additional Protests**" is argumentative.

**32.** **Immediately after the November 25 meeting, Plaintiff protested in front of the Library Ask Desk with a sign that read "Free Speech Died Here Tonight, Ask Me How."**

Controverted as argumentative ("protested") and object to lack of foundation (intent to protest) and speculative as none of the defendants can speak to Dr. Spiehs' state of mind or know what his intent was.

**33.** **Library employee Jon Ratzlaff twice asked Plaintiff to put away his sign, but plaintiff refused. Ratzlaff then asked Plaintiff to leave the Library since he would not comply with the request to put the sign away. When Plaintiff still refused to comply, Ratzlaff informed Plaintiff he would call the police to assist.**

Controverted and objected to as the citation to "PITS report" which does not support the citation, contains no foundation as to being sworn under oath or true, and how they purport to know. It is further controverted as the video shows that Ratzlaff confronted Dr. Spiehs and told him his sign was not permitted. Ratzlaff then offered to show Dr. Spiehs where he would permit the sign outside of the Library. Ratzlaff called the police but police told Dr. Spiehs they weren't enforcing this no-sign policy and that he could remain in the Library with his sign. **Ex. 2 (a) & (b)** (**Spiehs** time marks **25:05, 25:58, 1:17:45; Eravi 37:38, 38:34**)

**34.** **Plaintiff refused to leave, and Ratzlaff requested assistance from the Lawrence Police Department to remove the Plaintiff from the Library.**

Controverted and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or true in

4

any PITS report and how they purport to know.  **Ex. 2 (a) & (b) (Spiehs at 25:07, 1:22:03; Eravi at 38:34 & 1:34:26)**

**35. Two LPD officers responded to the call and spoke to Plaintiff. Plaintiff voluntarily left the Library shortly after speaking with the officers.**

Controverted and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or true, and how they purport to know.  Controverted as the police told Dr. Spiehs they were not enforcing the Library's sign policy and that Dr. Spiehs was free to remain at the Library with his sign. **Ex. 2 (a) & (b) (Spiehs 1:05:10, 1:12:55 1:24:21  Eravi 1:17:45 1:25:25 1:28:33)**

\* The heading "**November 26, 2024 – Plaintiff Protested at Library**" is a legal conclusion and argumentative ("protested").

**36. Plaintiff entered the Library the next day, on November 26, 2024, and began protesting with a sign in front of the Ask Desk.**

Controverted and objected to as the citation to "PITS report" does not support the citation and contains no foundation as to being sworn under oath or true, and contains no foundation as to who wrote those statements in any PITS report and how they purport to know.  It is further controverted as argumentative and speculative ("began protesting with a sign" as Dr. Spiehs displayed his shirt first). *See* **Ex. 2 (c) & (d) (Spiehs 1:30  Eravi :45)**.

**37. Star informed Plaintiff that Library policies did not allow him to hold his sign and that he would ask that Plaintiff leave the Library if he was going to continue protesting. When Plaintiff refused to stop protesting and subsequently refused to leave the Library, police were again called to assist with removing Plaintiff.**

Controverted and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or true and how they purport to know.  Further controverted as Star did not refer to "protesting" but instead said "signs" were prohibited.  **Ex.1a** See **Ex. 2, (c) & (d) (Spiehs 17:00 Eravi 16:33)**

- The heading "**December 1, 2024 – Plaintiff Protested at Library with Blank Sign**" is a legal conclusion and argumentative.

**39**. **On December 1, 2024, Plaintiff again entered the Library and began protesting in front of the Ask Desk, this time with a large, blank poster.**

Controverted and objected to as the citation does not support the assertion and constitutes speculation as to Dr. Spiehs' state of mind and is further controverted as Ratzlaff did not use the word "protest" or "protesting" but instead merely referred to Dr. Spiehs' signs. Argumentative as to "poster." The citation to the PITS report has no foundation as being sworn under oath or being true. *See* **Ex. 2 (e)-(g)** (12/1/2024 videos).

**40**. **A separate patron was also protesting inside the Library on December 1, 2024. Star asked him to put his sign away and then read the patron the Free Speech Activities Policy. The patron refused to comply with Star's request.**

Controverted and objected to as argumentative and vague ("patron"), argumentative as to "protesting," and controverted as to "asked" which Star *instructed* the individual to remove the sign. **Ex. 1**(ECF 112-2) *See* **Ex. 2 (g) (Baston 1:30 5:50)**

**41**. **Library executive director Brad Allen called the police department to inquire of a sergeant as to what they should do given the repeated protests by Plaintiff and others. Officers arrived at the Library, spoke with Plaintiff, but did not speak to any Library staff. The officers then left the Library, and Plaintiff left minutes later.**

Controverted as to Allen's lack of foundation or personal knowledge as to what happened at the Library as Allen was not there, argumentative as to "protests." It is further controverted as the police refused to enforce the sign policy and allowed Dr. Spiehs to remain with his sign at the Library. **Ex. 1** (ECF 112-2); *See* **Ex. 2 (e)-(g) (Spiehs 18:17  Eravi 18:01)**

**45.** **Following this event, Plaintiff left the auditorium and began protesting by the Library drinking fountain.**

Controverted and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or being true in any PITS report and how they purport to know.  Controverted as "protesting" is argumentative and speculative as to Dr. Spiehs' state of mind. *See* **Ex. 2, (h) (Spiehs 1:47:25)**

**46.** **Ratzlaff requested Plaintiff remove the sign, but he refused. Ratzlaff then asked Plaintiff to leave the Library, but he again refused.**

Controverted and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or being true and how they purport to know.  Further controverted as Dr. Spiehs did not answer the request to leave. *See* **Ex. 2, (h) (Spiehs 1:49:53)**

**48.** **Plaintiff failed to follow the reasonable direction of Ratzlaff to comply with Library policies, so Ratzlaff called Lawrence Police Department for assistance in removing Plaintiff, who was now trespassing.**

Controverted and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or true and how they purport to know.  Further objected to as argumentative ("reasonable direction") and a legal conclusion as to "now trespassing." *See* **Ex. 2, (h) (Spiehs 1:49:53)**

**49.** **Plaintiff voluntarily left the Library prior to any interaction with any LPD officers.**

Controverted and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or true and how they purport to know.  Further controverted as the Lawrence police never came to the Library and Dr. Spiehs remained in the Library until it closed.  **Ex. 1** *See* **Ex. 2, (h)-(i) (Spiehs 2:04:24  Eravi 28:34)**

**50.** **Plaintiff's actions in his failure to follow the reasonable request from Ratzlaff and the need to call local police officers resulted in a one-week suspension from Library grounds, running from March 37, 2025, to April 2, 2025.**

Controverted and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or being true statements.  Further controverted as argumentative ("reasonable request").  It is further controverted as Dr. Spiehs was not informed of this ban.  **Ex. 1 (ECF 112-2);** *See* **Ex. 2, (h) (Spiehs 1:49:53)**

**52.** **Plaintiff was told by a Library security employee that he was still suspended and could not return until the suspension ended, but Plaintiff refused to leave the Library.**

Controverted and objected to as the citation to "PITS report" which does not support the citation and contains no foundation as to who wrote those statements. *See* **Ex. 2, (j) (Spiehs 2:04)**

**53.** **The employee told Plaintiff he would call police to assist, but if he had to call police, Plaintiff would be suspended for three months. Plaintiff again refused to leave.**

Controverted and objected to as the citation to "PITS report" which does not support the citation and contains no foundation as to who wrote those statements.

See **Ex. 2, (j) (Spiehs 2:04)**

**54.** **Library staff then called police. When LPD officers arrived, Allen informed Plaintiff and the officers of the three-month suspension, and the officers then walked Plaintiff out of the Library.**

Controverted and objected to and objected to as the citation to "PITS report" which does not support the citation contains no foundation as to being sworn under oath or being true statements.  It is further controverted as the police initially said Dr. Spiehs could remain in the Library but then told him he had to leave else be arrested for trespass.  **Ex. 1** (ECF 112-2) *See* **Ex. 2, (j) (Spiehs 3:40 7:14  20:04  Eravi 1:16)**

### ADDITIONAL FACTS

1. Defendants Brad Allen and Kathleen Morgan do not claim they were given authority by the Board of Library Trustees to create or modify Library Policy regarding speech or conduct at the Library. Defendants' Exhibits **ECF 109-2** (Allen sworn statement); **109-5** (Morgan sworn statement).

2. Defendants do not say when Morgan's no-sign / anti-protest prohibitions began or why. Exhibits **ECF 109-2**; **109-5**

3. Heather Kearns, Tristan Star, Marc Veloz, Kathleen Morgan, Lauren Taylor, Sarah Mathews, and Karen Allen physically prevented Dr. Spiehs from entering the Library's auditorium. Plaintiff's **Ex. 1, ¶16** (ECF 112-2)

4. When the Library hosted auditorium doors opened for the public on June 11, 2023, titled "Deja's Reading Rainbow" the meeting was "open to all ages" including Dr. Spiehs.  **Pretrial Order, p.4**; Plaintiff **Ex. 1a, ¶3.¶**

5. When the defendants refused to permit Dr. Spiehs into this public event, it was still open to the public.  It was only when defendant Morgan said that it could be converted to a private event if the event paid money to the Library.  Plaintiff **Ex. 1a, ¶¶3-5.¶**

6. After that happened, that is when Kathleen Morgan and Heather Kearns told Dr. Spiehs that he could not enter the Library room because it was converted to a private event.  When Lawrence police arrived Kathleen Morgan told the officer that Dr. Spiehs was to be removed from the Library because of his signs.  Dr. Spiehs was forced to leave the Library by these individuals using the Lawrence City police. Plaintiff **Ex. 1, ¶19** (ECF 112-2)

7. Tristan Star told Dr. Spiehs that "we've been over this before with the signs" and Dr. Spiehs waited outside the same Library auditorium as the May 17th event. **Ex. 1, ¶23** (ECF 112-2)

8. Tristan Star told Dr. Spiehs "I know you want to be internet famous and all that" but that he wasn't going to allow the signs like that which "make people feel uncomfortable."  He told Dr. Spiehs that "we aren't a public library technically." **Ex. 1, ¶24** (ECF 112-2)

9. On June 11, 2023, Dr. Spiehs entered the Library and entered the room where "Deja Brooks" was to speak and as he waited he quietly and silently displayed his signs. **Ex. 1, ¶26** (ECF 112-2)

10. Tristan Star again confronted Dr. Spiehs  and claimed that Dr. Spiehs was being disruptive when Dr. Spiehs hadn't said anything and was sitting calmly and quietly making no movements.  **Ex. 1, ¶27** (ECF 112-2)

11. Then two Lawrence City police officers entered the Library auditorium. Ex. 1, ¶30

12. Because of the demands of Tristan Star and Karen Allen, Dr. Spiehs felt he had no choice under threat of arrest by police but to leave involuntarily. **Ex. 1, ¶31**. He left under duress and threat of arrest. **Ex. 1, ¶32** (ECF 112-2)

13. The "incident tracking database" is a software program called the "Patron Incident Tracking System" (PITS).  Dr. Spiehs did not know it at the time but when he made open record requests of the Library he discovered that the Library, unknown

to the individual, places individuals in this PITS database meting out bans to the individual even though the individual doesn't know it. **Ex. 1, ¶34** (ECF 112-2)

14. Brad Allen stated under oath that video recordings are not retained unless they involve a "security risk or criminal investigation."  The Library did not retain any video recordings of Dr. Spiehs which means they did not consider anything Dr. Spiehs did to be a security risk or criminal. **Ex. 1, ¶37** (ECF 112-2)

15. A purpose of the PITS database is to incrementally increase consequences to those the Library labels as "perpetrators" categorizing as "1st Offense" thorough "4th Offense and beyond." **ECF 109-16** (Library Training matrix on offenses).

16. The Training matrix states "If a patron refuses to comply after first warning and chooses to/is asked to leave for the day, should the patron do the same behavior again, skip straight to the third offense level of the matrix. In these cases, staff may also choose to apply a more serious suspension if there is a 4th offense. **ECF 109-16**

17. There is no provision in the Training matrix in which a purported "perpetrator" is provided notice and opportunity to be heard prior to or after the consequence is given by Library employee. **ECF 109-16**

18. In that material it provides for "offenses" that "unreasonably interferes with other patrons' ability to use the Library and its facilities," "chronic sleeping that causes significant disturbance to others," and "behavior that is disruptive to others' use of the library. This includes being loud in a quiet area, being unreasonably loud in any area of the library." **ECF 109-16**

19. In every event documented in the PITS database the reporter never categorized any of Dr. Spiehs' speech or conduct in any "interference," "disturbance," or "disruptive" category.  Instead, the category "disregarding the reasonable direction of staff" was utilized.  **Ex. 1a ¶10** (Spiehs second statement)

20. In the PITS database produced by the defendants, there is no notation of "protesting" or an offense called "protesting." **Ex. 1a ¶10**.

21. On November 25, 2024, Dr. Spiehs entered the Library and held up a piece of 11 x 16 inch paper with the words "Free Speech Died Here Ask Me How" while silently standing.  Another individual, Michael Eravi, also came in and displayed a print out

of the Library's Free Speech Activity Policy on a 8 ½ x 11 inch size piece of paper. The Library facilities manager Jon Ratzlaff, demanded that Dr. Spiehs stop displaying his paper. **Ex. 1, ¶42** (ECF 112-2)

22. Ratzlaff instructed Dr. Spiehs to leave the library and when he did not, Ratzlaff called the police.  When police arrived they told Dr. Spiehs that he was being instructed by Ratzlaff to leave because of his paper he was holding.  **Ex. 1, ¶43** (ECF 112-2)

23. But Ratzlaff did not tell Michael Eravi that he had to leave. The police officer said he would write a report to be sent to the city prosecutor. **Ex. 1, ¶44** (ECF 112-2)

24. In the PITS report dated November 25, 2024, a "suspension" was notated for Dr. Spiehs and the following was written (which Dr. Spiehs does not contend everything written in a PITS report is true):

> At 2:29 Justin Spiehs unrolled a sign in front of the Ask Desk. I approached Justin soon thereafter and asked him to put away his sign. Justin made no reply, so I repeated the question. Michael Eravi was close by, filming us and started to speak for Justin, but I asked him to let me finish speaking with Justin and then I would talk with him afterwards. I told Justin that since he would not comply with a staff request I would have to ask him to leave, and again there was no response from Justin. I repeated my request to have him leave one more time. I then explained that if he would not leave, I would call the Lawrence Police for their help removing him from the premises.
> I called Dispatch at ~2:32 and Sergeant Verbanic arrived ~2:56.
> After speaking with me, Sgt. Verbanic spoke with Justin and Michael, and then came back to me.
> At 3:27, Sgt. Verbanic asked me to accompany him and had me ask Justin to leave the building so that it would be recorded on his body camera.
> Sgt. Verbanic explained to Brad and I that he would write a report and submit it to the Municipal Court and a Municipal Prosecutor would decide if they would press charges against Justin.
> At 3:46 Justin and Michael left the Ask Desk area and spent about 8 minutes looking around before leaving the building.
> **Ex.1a, ¶12**

25. On November 26th, 2024, Dr. Spiehs returned to the Library and displayed the same piece of paper that he held on November 25th.  He also wore a shirt with the same message "Free Speech Died Here Ask Me How."  Tristan Star and Library employee Josh Lyles confronted Dr. Spiehs and they told him to stop displaying the

piece of paper else they would call the police to have Dr. Spiehs removed.  Three Lawrence police officers arrived and confronted Dr. Spiehs about the piece of paper and instructed Dr. Spiehs to leave the Library. No one took any issue with Dr. Spiehs displaying the same message on his shirt. **Ex. 1, ¶45** (ECF 112-2)

26. In the PITS database dated November 26, 2024, Dr. Spiehs was again labeled a "perpetrator" with the following consequence: "1. Suspension (Justin Spiehs) NOTE: Justin has not been informed of this suspension as of Tuesday evening the 26th." **Ex. 1a, ¶13**

27. In the PITS database for November 26, 2024, it also states the following:

> This patron entered the library with a folded sign and approached the Ask Desk. The patron, Justin Spiehs, unfolded a sign that read "free speech died here ask me how." at about 5:40. Tristan spoke with the patron and informed them that the library's rules do not permit patrons to hold or carry signs. The patron did not respond to Tristan and continued to stand in front of the Ask Desk with his sign. Tristan notified the patron that the police would be called if he did not leave the building. The patron again did not speak and continued to stand with his sign displayed. The police were called and two officers arrived shortly after. The two officers waited for a supervisor to show up. The supervisor advised the security team that they would ask Justin to leave the building. The officers spoke with the patron, who ultimately refused to leave. The officers told the security team that they would document the incident and submit the paperwork to their legal team for further instruction. Justin left the building at about 6:24.

**Ex 1a ¶14**

28. On December 1, 2024, David Basten entered the Library carrying a paper displayed saying "This public library should be defunded for constitutional violations!" **Ex. 1, ¶47** (ECF 112-2)  Basten was confronted by Tristan Star and told to leave.  Basten remained in the Library. **Ex. 1, ¶47**  Dr. Spiehs entered the Library. Brad Allen called police.  Unknown to Dr. Spiehs, he was again placed in the PITS database as a "perpetrator" for disregarding direction of staff.  **Ex. 1, ¶47**  Dr. Spiehs entered the library carrying a blank piece of cardboard.  According to the PITS database, Jon Ratzlaff didn't talk to Dr. Spiehs because he claimed "since we have twice told him that Free Speech Activities were not allowed, we declined to tell him a third time" and that he claimed Dr. Spiehs knew he "can't have a sign." **Ex. 1, ¶47** The police were called by the library director Brad Allen and confronted Dr. Spiehs

about his blank cardboard.  Allen attempted to have the officer charge Dr. Spiehs with harassment because of Dr. Spiehs' blank cardboard. The officers refused and left. **Ex. 1, ¶47**

29. In the PITS database for December 1, 2024, the following is written about David Baston: "disregarding the reasonable direction of staff" and "Suspension" and "This patron entered the building holding a sign. I notified him about the Library's Policy about signs and free speech. I gathered a copy of the Free Speech Activities Policy and read them to him. He remained silent and continued throughout the Library."
**Ex. 1a, ¶15**

30. In the PITS database for December 1, 2024, Dr. Spiehs is again cited for "disregarding the reasonable direction of staff" and the following notated:

At 2:38 Justin Spiehs entered the library with a large (~2' X ~3') blank piece of white poster board and proceeded to the area close to the ask desk, next to the "Ribbon of Light" signage and additional mounted glass artwork.
At ~2:49 Brad called the LKPD non-emergency number and requested to speak with a sergeant regarding the incidents at the library. Brad did not make a request for police at the library, but it appears they did so regardless.
At 2:53 two police officers entered the building, approached Josh at the Hello Desk, and asked him if he called the police. Josh replied that he had no idea who called them and they immediately headed toward the Atrium.
The police proceeded to have a conversation between the Ask Desk and the stacks with Michael Eravi, who followed the police from the Entryway Lobby, and Justin Spiehs. A third officer arrived at 3:00 but did not speak with Eravi or Spiehs.
Police left at 3:05 without speaking with any staff on their way out.
Spiehs, Eravi, and the unknown patron from PITS incident 0000000220 all left the campus together at 3:07
Since library staff did not talk directly with Justin during this incident, a Follow up has not been made. - Jon
**Ex. 1a ¶16**

31. On December 9, 2024, the library displayed transgender and LGBTQ pride flags inside the library.  **Ex. 1, ¶48**. (ECF 112-2)  Dr. Spiehs entered the library that day and silently stood displaying a "Don't Tread on Me" flag.  He was informed by the Library security guard Darin McQueen that Dr. Spiehs  was not permitted to display his flag because it was considered "expressive conduct or speech" and "protesting".
**Ex. 1, ¶48**.  At the same time, Michael Eravi stood with a LGBTQ pride flag draped around his shoulders.  McQueen stated that Mr. Eravi was not violating the free

speech activities policy with his displayed flag because of how he was holding the flag compared to how Dr. Spiehs held his flag. **Ex. 1, ¶48**. McQueen put Dr. Spiehs into the PITS database as a perpetrator. **Ex. 1, ¶48 Ex 2 (l) (Spiehs 3:29 7:54 12:56 15:15 18:50) Ex, 2 (n) (Eravi 26:19) Ex 2 (o) (Eravi 1:10)**

32. In the PITS database for December 9, 2024, Dr. Spiehs is again cited for "disregarding the reasonable direction of staff" and the following notated:

> At 3:19 Justin Spiehs entered the library and proceeded to the area just south of the Ask Desk where he engaged in a Free Speech Activity. Since we have twice told him that Free Speech Activities were not allowed, we declined to tell him a third time. At ~3:47 he moved from the area south of the Ask Desk and moved to an area west of the Hello Desk. Michael Eravi was with him at this point and they asked Darin if anyone was going to come talk to them about this (indicating the Free Speech Activity), to which Darin reminded them that Justin already knows he can't have a sign at the library. They requested to speak with a member of administration, who were unavailable. They requested a copy of the Free Speech Activities policy, and Darin retrieved it for them and then read it at their request. They left the library at 4:06. **Ex. 1a ¶17**

33. On March 27, 2025, Dr. Spiehs attended a public event at the library carrying a message "This library uses LPD violence to stop free speech" written on cardboard. He entered the library with these messages displayed and he attended the entirety of the event without incident. **Ex. 1, ¶49**. (ECF 112-2) When the event ended he exited the meeting room and asked Jon Ratzlaff if he was going to be placed on the PITS database again for having these messages inside the library. **Ex. 1, ¶49**. Ratzlaff falsely stated to Dr. Spiehs that he had not displayed the messages inside the library. **Ex. 1, ¶49**. Dr. Spiehs went back into the library and stood silently displaying his message again.

34. Ratzlaff followed Dr. Spiehs back into the Library and immediately confronted Dr. Spiehs stating Dr. Spiehs could not show the words on his cardboard and told him to leave the library. He stated if Dr. Spiehs did not leave he would call the police which he did. **Ex. 1, ¶49**. (ECF 112-2)

35. Ratzlaff told the police over the phone that Dr. Spiehs' library access had been suspended. The police declined to enforce the Library's free speech activities policy and they did not physically arrive to the Library. **Ex. 1, ¶49** (ECF 112-2)

36. On March 31, 2025, Dr. Spiehs entered the Library to attend an event and carried a message "Trump is right: if you are born with a dick then you are not a chick." written on cardboard. **Ex. 1, ¶50** (ECF 112-2)

37. Upon entering the Library he was immediately confronted by Library employee McQueen who told Dr. Spiehs (for the first time) that he had been banned for a week from the Library. **Ex. 1, ¶50** (ECF 112-2)

38. McQueen told Dr. Spiehs that unless he left the Library immediately that he would call the police and that Dr. Spiehs would be banned from the library for an additional 90 days. **Ex. 1, ¶50**. McQueen called the police. **Ex. 1, ¶50** (ECF 112-2)

39. Lawrence Police arrived and allowed Dr. Spiehs to remain in the Library while holding his cardboard with those words written on it. **Ex. 1, ¶50**. A few minutes later Brad Allen confronted Dr. Spiehs in the Library and declared that Dr. Spiehs was banned from the library for 90 days. **Ex. 1, ¶50** (ECF 112-2)

40. Dr. Spiehs was placed into the Library PITS database again. **Ex. 1, ¶50** (ECF 112-2)

STANDARD

The Court is familiar with the summary judgment standard. *See **Spiehs v. Larsen,** No. 5:23-Cv-4107, 2025 WL 721946 At \*1 (D. Kan. Mar. 6, 2025)*.

DEFENDANTS NO-SPEECH ZONING ORDINANCE IS UNCONSTITUTIONAL

In a quixotic dystopian regime, this city public library, which purports to be the bastion institution of all First Amendment speech, has become not merely the opposite but gone further in actually penalizing, if not actually criminalizing, protected free speech. Its ban on "protesting" is so wildly undefined that it includes holding a blank piece of paper or even displaying a book contained in the library. This Library has enacted its own kind of pseudo zoning ordinance. It functions as a trespass-zoning mechanism like a "drug free zone" used by cities in public housing. The defendant Library similarly has created its own pseudo zoning ordinance barring

15

speech in its Library.  This violates the Constitution.  In **Huminski v. Corsones, 396 F.3d 53 (2d Cir. 2005)**, it told the lower court to enter summary judgment in favor of plaintiff's First Amendment claims in response to a trespass notice banning him from public courthouses and their surrounding areas.  "Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." **Id. at 89.**  And in using its stealth Kafkaesque tribunal this Patron Incident Tracking System (PITS) which Dr. Spiehs refers to as the Library's "naughty list" it had no operative procedure of pre or post notification of a trespass warning (and in fact never notified Dr. Spiehs of the charges).  This Library fails to see the distinction between a private business (no shirt no shoes no service) and that of a public library.  These Library employees are given free arbitrary reign to deprive citizens – even for merely *disobeying* the employee. *See **Catron v. City of St. Petersburg,** 658 F.3d 1260, 1267 (11th Cir. 2011)* ("trespass ordinance causes a substantial risk of erroneous deprivation of liberty because it is seemingly easy for the City – through a variety of agents – to issue a trespass warning and because no procedure is provided for the recipient of a trespass warning to challenge the warning or for the warning to be rescinded"). "The ease with which trespass warnings may be issued is particularly problematic here because the trespass ordinance provides no procedural means for a warning-recipient to challenge the warning." **Id. at 1268.** There are no standards governing the exercise of the discretion granted by the Library's no speech pseudo ordinance which permits and

encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for "harsh and discriminatory enforcement by" Library employees against speech "deemed to merit their displeasure." ***Thornhill v. Alabama,*** **310 U.S. 88, 97-98(1940)**.

### DEFENDANTS' PURPORTED PURPOSE IN INSULATING LIBRARY PATRONS FROM PROTECTED SPEECH DOES NOT EVEN PASS THE RATIONAL BASIS TEST

This public library did something quite remarkable in terms of its response to Dr. Spiehs' lawsuit:  rather than acknowledging its prior bad behavior it instead doubled down by multiplying exponentially every prohibition to protected speech it could possibly theorize.  And why?  It claims its interest is not safety or the welfare of its patrons.  Dr. Spiehs never presented a safety or security risk tacitly admitted by defendant Allen who stated the Library would have retained videos of Dr. Spiehs if such existed – which the Library did not retain.

"Rather, it is to insulate them from protected speech itself claiming that the Library must protect the "study" and "enjoyment" of citizens who check out or read books in that Library.  This is not a compelling state interest, it is not even a significant state interest, and it is actually irrational in all of its applications.  It permits some speech that might affect the "enjoyment" while prohibiting others.  It permits some individuals to opt out completely from the category of "speakers" into "sponsors" who are untethered to the Library's onerous restrictions.  And why are employees of the Library entitled to do all of things "speakers" are not that might affect "study" or "enjoyment" while others, including Dr. Spiehs, are not?  The defendants memorandum refuses to analyze any of the actual prohibitory language

contained in its policies and for good reason.  The Court should deny the defendants'
motion for all the reasons stated in the plaintiff's memorandum for summary
judgment and in this response.

### DEFENDANTS' CLAIM THAT ITS LIBRARY IS A LIMITED PUBLIC FORUM IS WRONG

Defendants wordsmith the definition of "designated public forum" using some
mental gymnastics  to say it is a "designated public forum *for a limited purpose*." ECF
109, p.14.  This is akin to being a little bit pregnant.  It is a distinction that the law
does not recognize – there is either a designated public forum or a limited public
forum – not another *in-between* those-two-forums forum.    First Amendment
protections are broadest for speech in traditional public forums and designated public
forums. ***Doe v. City of Albuquerque,* 667 F.3d 1111 (10th Cir. 2012)**.  Defendants jump
ship from the clear holding in ***Doe v. City of Albuquerque*** that libraries are designated
public forums to the Third Circuit case of ***Kreimer v. Bureau of Police for Town of
Morristown*, 958 F.2d 1242 (3d. Cir. 1992)**. ***Doe*** clearly states that the analysis is
content-neutral time, place, and manner restriction. ***Id.* at 1128-31**. Those restrictions
must (a) serve a significant governmental interest, (b) be narrowly tailored to advance
that interest, and (c) leave open ample alternative channels for the exercise of the
constitutional right at issue. ***Id.* at 1130-31**. *Kreimer* supports the plaintiff as it plainly
states that due process is required to bar someone from accessing the library. ***Id.* at
1262-65**. Defendants do not contest that Dr. Spiehs messaging was political speech.
It "is entitled to special protection."  ***Connick v. Myers*, 461 U.S. 138, 145 (1983)**.
Defendants attempt to convert its Library into a forum more restrictive than a school
in prohibiting "protesting" – but the Supreme Court long ago held that even students

could "protest" in a school.  *See **Tinker v. Des Moines Independent Community School***

***District**, **393 U.S. 503 (1969)*** (upheld the First Amendment right of public-school

students to wear black armbands at school in protest of the country's involvement in

the Vietnam War).

### COUNT 2 FACIAL CHALLENGE TO CURRENT POLICIES

The meaning of "protesting" is on its face viewpoint discriminatory.  Merriam-

Webster's Online Dictionary says it means the "act of objecting or a gesture of

disapproval." It can mean a "complaint, objection or display of unwillingness usually

to an idea or a course of action." Or a "solemn declaration of opinion and usually of

dissent."   A protest is viewpoint negative.   A protest can never constitute a

compliment – a favorable view.  Thus the Library's anti-protest policy prohibits all

negative speech about any subject while allowing positive speech on the same subject.

Thus Dr. Spiehs could be allowed to parade in the Library silently carrying a sign

saying "**More Drag Queens Please!**" as support while not being allowed to say "**No**

**More Drag Queens Please!**"

Defendants' argument on page 15 of its memorandum is wholly conclusory

without any mention of the actual language used in the current Free Speech Policy.

It only quotes part of the prior policy language which recites "behavior that disturbs

others' use of the library, creates an unsafe environment, impedes work of library

staff, or creates a risk of damage to library property is not permitted."  But that policy

is not subject to a facial challenge and is irrelevant on this one issue.  The Library

then goes on in analyzing the Reservation Room Policy (which is not at issue), then

the Exhibit and Display Policy.  But no analysis at all on the current Free Speech

Activities Policy.  The Free Speech Activities Policy purports to define "free speech activities" but it does not because it utilizes the phrase "include, but are not limited to." This leaves the definition open ended.  Thus, an individual would have to guess as to what other speech is purportedly being restricted.  Then it defines it to include "holding or carrying signs." "Sign" is not defined.  Noteworthy in this prohibition is that beyond the "holding" or "carrying" language, it still does not prohibit all displays of a sign.  "Signs" can be created within the Library. That is, creating it on the spot: not holding the sign but creating it alone without holding it.  No one can anticipate whether a "sign" includes a symbol such as a cross around one's neck, a flag, a book, a flyer, or even a blank piece of paper which defendants absurdly claim is a "poster." Posters require a message to promote something.  The Policy then defines Free Speech Activities to include any "expressive conduct or speech" which subsumes the limitless world of every other category and makes those restrictions redundant.

First Amendment analysis employs a question as to whether a substantial number of [the law's] applications are unconstitutional judged in relation to the statute's plainly legitimate sweep." ***Moody v. NetChoice, LLC,*** **603 U.S. 707, 723 (2024)**. ***Moody*** lowered what was formerly "that very high bar" of proving no set of circumstances for analyzing a facial challenge to a statute under the First Amendment.  Put another way, the "law's unconstitutional applications" must "substantially outweigh its constitutional ones." ***Id.* at 724**.  This standard requires a plaintiff to show that a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." ***Id*.  In

the Library's Free Speech Activities prohibitions, in a wildfire fashion sweeps up a vast majority of unconstitutional applications. The "first step in the proper facial analysis is to assess the [policy's] scope. What activities, by what actors, do the laws prohibit or otherwise regulate?" *Id.* at 2398. The Court then decides "which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.*

Looking at the below words and phrases this Court is tasked to "explore the laws' full range of applications – the constitutionally impermissible and permissible both – and compare the two sets." *Id* at 2388. There is the over inclusiveness and under inclusiveness of these policies. A law is overinclusive when it regulates too much conduct. "Distributing literature," "acting as a public speaker," and "requesting signatures/donations/contributions" are also swept within the Free Speech Activities dragnet. What does it mean to "act as a public speaker"? Who would possibly know what speech or conduct that entails. One can act as a "private" speaker but not of the "public" kind – which again has no contours of meaning. If one sat down in Library hallway next to two individuals and struck up a conversation with both simultaneously, is that being a "public speaker"? What converts a person's conversation with one, two, or three individuals into the dreaded "public speaker" category? Is it the posture (standing versus sitting)?

This policy is underinclusive because it leaves unregulated similar conduct that also threatens the compelling interest that the state action purports to advance. Why is distributing one form of speech (literature) prohibited when other

distributions of other speech are not?  But what if "Literature" means anything written?  One cannot give a newspaper, magazine, or book to someone else in that Library.  Does it also include wrappers – messages on candy bars or soda cans?  What is the purpose of prohibiting written speech versus other speech such as flags, symbols, or other media containing speech?  "Literature" is not defined.  *See* Webster's 7th New Collegiate Dict. (1969) p. 494.( "writings in prose or verse" or "printed matter").  **Webster's Third New International Dictionary 1321 (unabridged ed 1993)** ("Literature" is defined as "writings in prose or verse; esp: writings having excellence of form or expression and expressing ideas of permanent or universal interest"). "Writings" would include various dictionary entries as stories, poems, and plays that have value as art.. Literature would include all of the books and written material in the Library itself.  Could it include a placard, pamphlet, booklet, book, sign, or any other written, printed, or graphic material?  Of course, the Library itself distributes literature all day long.  Why is its distribution of literature acceptable but for anyone else forbidden?  Putting aside that none of those prohibitions provide notice of what actually is prohibited, the vagueness is doubled because this speech and activities are coupled to the vague and subjective idea of what "would interfere with study and enjoyment of visitors of the Library." Does "interfere" include "distract" or cause to lose focus?  And why is giving or asking for an autograph, signing a legal document, or asking a friend or parent for money not vague?  Is that what the "requesting signatures/donations/contributions" means?  These prohibitions are astounding in not only their overbreadth but their sheer audacity in erecting this no-free-speech

22

zone. But this is not a school library. The purpose of government school libraries is to advance the school curriculum. *See* ***Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.,* 200 F.3d 1128, 1133-36 (8th Cir. 1999)**. This city library is not an abortion clinic with buffer zones, a courthouse, or a medical facility. This converts in wholesale fashion this public forum to little more than a second grade class during a silent reading exercise.

Putting all of those vagaries aside, how exactly would one know when "study" and "enjoyment" of any individual is interfered with? That would be a complete subjective "in the eye of the beholder" restriction. "Study" and "enjoyment" are hopelessly vague. It would reduce free speech to the lowest common denominator of what could possibly "interfere" similar to the "eggshell plaintiff." Thus, the individual suffering ADHD would be more sensitive to purported distractions.

The application of these prohibitions are virtually unlimited and subjective. Their application overwhelmingly violate the First Amendment.

### COUNT 2 AS-APPLIED CHALLENGE TO LIBRARY'S PRIOR POLICY AND CURRENT POLICIES

Recall that Dr. Spiehs has not resorted to shouting, bullhorns, or any personal confrontation with any person reading a book at the library. His only violation, according to defendants Allen and Morgan, come from their assertion he was "protesting" by silently holding a sign – sometimes with a message or other times with no message. But that is not how the PITS database recorded Dr. Spiehs' purported offenses. Despite having multiple categories referencing "interfering" or being "disruptive" nothing in that database accuses Dr. Spiehs of this. In fact, the

idea that "protesting" was prohibited in not referenced in the Training matrix or the PITS database itself. It is made up from whole cloth by Morgan and Allen. And both never say how they attained this authority to make policy or when this purported no-sign-no-protesting prohibition began.

The only written policy applicable to the May and June incidents are cited in defendants' Ex. 3 titled the "Behavior Policy." One can scour that policy and not find any prohibition to "signs" or the amorphous word "protesting." It claims to only prohibit "conduct" but its prohibitions reach to protected and unprotected pure speech. The Library claims that some of Dr. Spiehs' "signs had messages, some did not." ECF 109 p.18. Of course that begs the question: how does a paper become either a "sign" or a "protest" when it does not convey a message? The notion is ludicrous. Wouldn't both definitions implicitly carry a requirement of some kind of message? Particularly a "protest" which must convey a negative message versus a positive message about a subject. And if a blank piece of paper is subject to this prohibition, it is entirely arbitrary as to when that blank paper "protests" and other blank papers do not.

As to Dr. Spiehs' claims regarding this policy, it is as applied. In the May and June incidents, the defendants gave their reasons for having Dr. Spiehs' removed which was their claim he was carrying a sign – signs that they claimed made other feel "uncomfortable." According to the defendants, they did not interpret any of the "Unacceptable behavior" list as being applicable. Rather, defendants Allen and Morgan now claim after the fact that the "Policy Statement" general statement applied to prohibit, in their words, "protesting." The Court should recall that the plaintiff requested that the Library disclose what language it was relying upon to ban

Dr. Spiehs' speech.  *See* **Plaintiff's Ex. 3 (Library Interrogatory Answer No. 7)**.  It refused to provide that information then and only now does it provide this belated manufactured citation to the Policy language it now resorts to.

Both Allen and Morgan cite one provision from that Policy Statement as being applicable: both say "protesting" "is disturbing and disruptive to others' use of the Library."  But that encompasses protective speech and means any speech that purportedly "disturbs" a person or has a "disruptive" idea is banned in this public forum.  This is the classic "heckler's veto" giving the Library unbridled discretion to ban speech.  ***Spiehs v. Lewis,*** **No. 23-CV-04121-TC-GEB, 2024 WL 5107274 at \*10 (D.Kan. Dec. 13, 2024)** ("it is no answer to say that individuals (or Board members) may react poorly when discussed at a meeting" (citing ***Kennedy v. Bremerton Sch. Dist.,*** **597 U.S. 507, 543 n.8 (2022)**).  "Nor under our Constitution does protected speech ... readily give way to a heckler's veto." ***Id.***  A "heckler's veto" is one where governmental action silences "a speaker to appease the crowd…." ***Bible Believers v. Wayne Cnty.,*** **805 F.3d 228, 234 (6th Cir. 2015)**.  A "listeners' reaction to speech is not a content-neutral basis for regulation." ***Forsyth Cnty. v. Nationalist Movement,*** **505 U.S. 123, 135 (1992)**.  "Removing or [otherwise] silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose." ***Bible Believers,*** **at 248**.

And nothing in the videos – or even in Morgan's and Allen's respective statements – assert that any so-called "disruption" actually happened.  It was only a hypothetical.  Even if they cited some reaction by an individual, enforcement action against a peaceful speaker is prohibited.. *See* ***Brown v. Louisiana,*** **383 U.S. 131, 133 n. 1 (1966)** ("Participants in an orderly demonstration in a public place are not

chargeable with the danger...that their critics might react with disorder or violence"). This is not a legitimate time, place, and manner of speech restriction.

The Library paints pure hypotheticals: the "Library would fail to be a place for contemplation, reading, and writing *if* protesting or other disruptive behavior was allowed." **ECF 109, p.17**. This no-free-speech zone is completely dependent on what the Library theorizes as a zone of silence – even when a message on a shirt, paper, or cardboard utters no discernable volume. It has no significant government interest and is not narrowly tailored. And citing to this hypothetical patron made-to-feel-uncomfortable interest, Allen and Morgan fail to present "case-specific" evidence that anyone was purportedly "disturbed" or that this purpose "actually serves the stated goal." ***Brewer v. City of Albuquerque*, 18 F.4th 1205, 1214 (10th Cir. 2021)** ("government must present case-specific evidence that the restriction actually serves the stated goal without burdening too much speech in order to satisfy the narrow tailoring inquiry"). *See **McCraw v. City of Oklahoma City**, 973 F.3d 1057, 1080 (10th **Cir. 2020)** (concluding that safety concern was hypothetical and the ordinance prohibiting pedestrian presence on medians was not narrowly tailored).

## ULTRA VIRES AND RETALIATION

There is no doubt Morgan and the other Library employees were targeting Dr. Spiehs: on May 17, 2023, as the event was a public event. The Library defendants permitted a woman to block the entrance to the event stopping Dr. Spiehs from entering. That is when Morgan came up with a plan to target Dr. Spiehs by telling the woman if she paid money to the Library the event could be converted to a private

event.  This was pretextual and a jury could find this action was retaliatory because of Dr. Spiehs' messaging.

Then one also wonders how the other defendant Library employees were made aware of Morgan's unwritten no-sign prohibition.  Or why Tristan Star would enforce a sign ban when the actual policy did not so require.  The jury could find viewpoint discrimination and that Morgan and Allen's purported *ad hoc* unwritten policies are unauthorized.  A jury could first find there was never a policy prohibiting signs or protesting – or that this prohibition was purely *ad hoc* only created to target Dr. Spiehs.  A jury could find it was illegal and ultra vires from the start recognizing that only the Trustees have that authority and not individual employees. The rules of the Trustees apply and defendants do not cite any authority in which Allen or Morgan have the unilateral authority to bypass the Trustees and create their own *ad hoc* policies.

In any event, Dr. Spiehs could not "ignore the request and continue speaking." **Spiehs v. Lewis at \*11**.  This policy, as to the May and June incidents, policy "was applied to discriminate on the basis of viewpoint." *Id*. (citing **Gilmore v. Beveridge, No. 2:22-CV-02032, 2023 WL 4104579, at \*6 (D. Kan. June 21,2023)**).

### NO NOTICE / DUE PROCESS

Nowhere do the defendants claim they provided any prior notice or for that matter any due process to Dr. Spiehs prior to his censorship or forced removal. The prior policy certainly does not as defendants admit.  There was never any advance warning that Morgan or Allen had this unwritten anti-sign prohibition – one which

also triggered an anti-protest restriction.  And certainly no notice that this unwritten policy existed prior to its creation as only applied to Dr. Spiehs.  For that matter, there was never any notice of the precise standards that apply to what "protesting" encompassed by way of either conduct or speech. They applied this anti-protesting to another vague prohibition called "signs" – which is undefined.  According to the Library, protesting means displaying a flag a certain way, or carrying a blank piece of paper, or having a message on cardboard but not the same message on one's shirt. These restrictions fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. It authorizes or even encourages arbitrary and discriminatory enforcement. Allen and Morgan's moving target of ant-protesting was "adopted by the government because of disagreement with the message the speech conveys." *TikTok Inc. v. Garland,* 145 S. Ct. 57, 67 (2025).

The Court can see there are no guidelines to support Allen and Morgan's anti-protesting interpretation from this language.  *See M.S. News Co. v. Casado,* 721 F.2d 1281, 1290 (10th Cir.1983) ("lack of precise standards permits arbitrary and discriminatory enforcement").  And their stated imposition of no-signs-because-we-think-they-are-protests is wildly detached from the actual language of that first policy.  When the Library revised its policies – and rather amazingly after this lawsuit was filed – it doubled down on squeezing out protected speech.

Extrapolating an anti-protesting prohibition with no meaningful definition of what "protesting" actually entails by conduct or speech, it is unconstitutionally vague as was applied to Dr. Spiehs.  A jury could find that this interpretation was retaliatory

because of the message, *post hac* and pretextual and that the actual reasons and motivations was because of retaliation and viewpoint discrimination.  Dr. Spiehs was quiet, well mannered, and simply carrying a message pasted on a stick – and the same message he had on his shirt which no defendant fussed with him about.

The Library defendants admit the old policy does not prohibit "protesting": "it does not explicitly prohibit protesting with signs inside the Library." **ECF 109, p.16**. The Library claims it can have an unwritten policy that Allen and Morgan created. *Id.* ("fact that the policy against protesting with signs inside the library is unwritten is immaterial").  Defendants cite ***Faustin v. City & Cnty. of Denver, Colo.,* 423 F.3d 1192 (10th Cir. 2005)** which supports *Monell* liability for Allen and Morgan's unwritten policy and the lack of any safety interest where a city banned the display of signs and banners on overpasses. ***Id.* at 1200** (traffic safety and in the avoidance of interference with official traffic control devices on highway overpasses" constituted a significant interest).  Neither Allen nor Morgan cite any safety or operational interest in their no-speech policy.

### ALLEN AND MORGAN ARE POLICYMAKERS

The defendant Library, as well as both Allen and Morgan, assert that Allen and Morgan are policymakers. They claim that Allen and Morgan have the authority to make up unwritten policies for the Library.  They cite to the Behavior Policy in effect in May and June of 2023 but selectively quote the "Policy Statement" while omitting the actual language the purports to prohibit "Unacceptable behavior on the Library Campus." **ECF 109, ¶ 7** (Defendants' Memorandum, SOF 7).  Nothing in that prior Policy (**Def. Ex. 3**) refers to "protesting" in the "Unacceptable behavior" and the

quoted language they cite does not refer to "protesting."  The defendants claim that Morgan and Allen have the authority to interpret the quoted language omitting any mention of "protesting" to prohibit protesting.  They claim the "Library interpreted" which is an admission that Allen and Morgan can create new or different unwritten policies from the one actually written.  This destroys their assertion that there is no basis for a Monell claim as the Library has authorized Allen and Morgan to create new policy which has violated Dr. Spiehs' Constitutional rights.

### COUNTS 3, 4, AND 5 RETALIATION AND VIEWPOINT DISCRIMINATION AND EQUAL PROTECTION

The Library knew its original policy did not even purport to prohibit "signs" "demonstrating," or "protesting."  So disregarding Constitutional case law, it set out to do that very thing with its over-the-top language contained in defendants' 11/25/2024 Free Speech Activities Policy (**ECF 109-12, p.3**).  The problem the Library claims to address was not safety but instead the amorphous interest of "study" and "enjoyment" of Library patrons.  And this is the "actual problem in need of solving"? ***Brown v. Ent. Merchants Ass'n,*** **564 U.S. 786, 799 (2011)**.  And to that purported "problem" the Library literally went scorched earth in its totalitarian declaration that the Library would be a no-free-speech zone.

Consider first how the Library divides the world to insulate its patrons from protected speech – there are "speakers" and then there are "sponsors" and ":designated partners."  The Library made a sponsor exception to every speech and conduct prohibition applicable to a "speaker."  It provided that a "sponsor" is someone who reserves space in the library. **ECF 109-12 p.3**.  A sponsor then had authority to

designate a "designated partner" who is someone who "co-sponsors" or "affiliated with a sponsor." Then the Library requires that a "sponsor must identify a designated partner on promotion material to exempt their free speech activities from this policy."

But once qualified as a "sponsor," "co-sponsor," or "affiliated with a sponsor" none of the prohibitions applicable to the category of "speakers" apply. It states "this policy does not apply to sponsors and their designated partners who reserve space in the library for programming under the Reservable Room Policy or Public Event Policy." The language does not qualify the exemption or the geographic location of where the sponsor is located in the Library. Thus this policy removes the sponsor, co-sponsor, and designated partner from the definition of speaker. How does the Library's so-called "problem" of patron enjoyment solved by allowing individuals who pay the Library rent money to be totally exempt from all of the prohibitions that purportedly are designed to insulate those same patrons from the protected speech of a "speaker"?

As to all of its subsequent prohibitions in the current policy aimed at Patron "enjoyment" they are woefully below the bar of safety and even an individual's welfare. The Library's solution to its first behavior policy was to make an even broader policy which is nothing more than "burning the house to roast the pig." ***Butler v. State of Mich.,* 352 U.S.62 (1957)**, which the First Amendment does not allow. The Library's overinclusive prohibitions to protected speech does not even reveal any rational basis. *See **City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 448 (1985)** ("record does not reveal any rational basis for believing that the Featherston home

would pose any special threat to the city's legitimate interests"). The Library offers the same justification for the new policy that it offered for the old – it was adopted to ban the political and social-protest speech it views as disruptive, just in a more readily administrable way using the new and broader language. But this Policy, even if considered facially neutral (which it is not i.e. "protests" are bans on negative speech but not positive speech) violate the Constitution when the government's "asserted interest is related to the suppression of free expression... and concerned with the content of such expression." *United States v. Eichman*, **496 U.S. 310, 315, (1990)**. *See Ward v. Rock Against Racism*, **491 U.S. 781, 791 (1989)** ("principal inquiry in determining content neutrality... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.... The government's purpose is the controlling consideration.... Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech").   This is a policy objective of patron "enjoyment" is not legitimate and unworkable.  And these broad prohibitions are "not reasonably restricted to the evil with which it is said to deal." *Butler v. Michigan*.

### NO QUALIFIED IMMUNITY FOR INDIVIDUAL DEFENDANTS

The individual defendants make a generalized qualified immunity argument beginning on page 24 making the errant claim there was no Constitutional violation. There is no analysis as to each named defendant or for the injuries to Dr. Spiehs. Defendants' total analysis is this: "No Supreme Court or Tenth Circuit precedent clearly establishes that Plaintiff has a right to protest in a library or that he has a right to act in ways disruptive to others' use of a library."  This statement is wrong

factually and legally.  First, nothing Dr. Spiehs did was disruptive – defendants don't identify one individual who claimed to have his or her "study" or "enjoyment" interfered with.  And how could it?  Dr. Spiehs was silent holding paper, cardboard, or a flag.  Second, the conclusory allegation that all of Dr. Spiehs' speech and conduct is conflated into the category of "protesting" is wrong factually.  But assuming all of his speech and actions can be classified as "protesting" it has long been clearly established that protesting is protected speech.

So called "protest activity," by individuals and crowds, has manifested in the form of: picketing. ***Thornhill at* 99** (picketing protected under the First Amendment); marches ***Cox v. Louisiana,* 379 U.S. 536, 545-46 (1965)** (group that marched to courthouse was protected activity under the First Amendment); boycotts, ***NAACP. v. Claiborne Hardware Co.,* 458 U.S. 886, 907 (1982)** (boycotts form of speech protected by the First Amendment); placards, ***Boos v. Barry,* 485 U.S. 312, 318, 329 (1988)** (invalidating ban of displays of certain placards or signs within 500 feet of embassies, and noting that protest is "classically political speech" that "operates at the core of the First Amendment"); flag-burning ***Texas v. Johnson*, 491 U.S. 397, 404 (1989)** (overturning conviction for desecrating the American flag and citing protesting as a category of symbolic speech).  *See **Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006)** (labeling political demonstrations and protests as "activities at the heart of what the Bill of Rights was designed to safeguard"). Laws against protesters are overbroad because the statutes penalized expressive activity that was neither violent nor threatening, nor an incitement to immediate violence. In ***Minnesota Voters All. v.***

*Mansky,* **585 U.S. 1 (2018)** the Supreme Court held unconstitutional a Minnesota law that prohibited all "political" buttons, badges, or insignia inside a polling place. ***Id.* at 16**. It noted that although the polling place was a nonpublic forum, the law banned so much expression that it failed even the more forgiving reasonability standard. ***Id.* at 16-21**.

Defendants ignore the injuries to Dr. Spiehs including lack of any due process and the subsequent bans from the property besides the censorship and threats of arrest. A person of ordinary firmness would be chilled from continuing in the protected activity by Defendants' respective actions regarding Dr. Spiehs' speech and conduct. Even if the "effect on freedom of speech may be small" there "is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." ***Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)**.

Then being placed in the PITS database with its incremental punishments is an injury to Dr. Spiehs. Then these bans given with or without notice. A ban from government property are only reasonable "in situations of threat, constant harassment, or consistent disruption." ***Vollmecke v. Independence School District v. Independence School District*, No. 23-00644, 2023 WL 4524547 at \*8 (W.D. Mo. October 11, 2024)**. *See **Schmidt v Huff*, No. 25-CV-2081-EFM-GEB 2025 WL 901335 (Kan.D. 3/25/2025)** (enjoining ban from school property).

But even assuming everything that Dr. Spiehs said and did constituted "protesting" it has been clearly established law that protesting is protected by the First Amendment in a public forum. ***Index Newspapers v. United States Marshals Service,* 977 F.3d 817, 830 (9th Cir. 2020)** ("Public demonstrations and protests are

clearly protected by the First Amendment"); *Snyder v. Phelps*, **562 U.S. 443 (2011)** (reiterating that "speech on matters of public concern ... is at the heart of the First Amendment's protection"); *NAACP v. Claiborne Hardware Co.,* **458 U.S. 886, 907-12 (1982)** (boycott of local businesses "clearly involved constitutionally protected activity" including "speech, assembly, association, and petition"); *Collins v. Jordan*, **110 F.3d 1363, 1371 (9th Cir. 1996)** (denying qualified immunity as "activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment").      And it doesn't matter that Morgan, Allen, or the Library Trustees have declared mere protesting to be unlawful. The Supreme Court, in *Gregory v. City of Chicago,* **394 U.S. 111, 112 (1969)**, instructed that a demonstration, "if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment." Nothing that Dr. Spiehs did or said was anything but entirely peaceful and orderly. Defendants declaring "protesting" as "unlawful" did not strip Dr. Spiehs of his First Amendment rights.

Finally, in addressing the words that defendant Star said made unknown individuals "feel uncomfortable," in *Mejia v. Lafayette Consolidated Government,* **No. 6:23-CV-00307 2025 WL 890525 (W.D. La March 20, 2025)** that court dealt with some offensive words yet denied qualified immunity to a Library Board president regarding viewpoint discrimination during the Library board's public comment section.  The speaking section was a limited public forum.  *Id.* **at \*6**.  That plaintiff contested books in that Library and accused Board members as being a "groomer" and "grooming." *Id.*

The ***Mejia*** court held that there was an issue of fact as to whether the Board president's motivation for silencing the plaintiff was viewpoint discrimination. ***Id.*** **at** **\*7**. The court noted he was "registered to speak" and that his speech did not exceed the three minute limit. ***Id.*** The court stated his "remarks also do not appear to have disrupted the Library Board meeting in that they occurred after the Board had completed its business. Moreover, based on the audio recording of Brevis' remarks, it does not appear that Brevis was shouting, yelling, or otherwise disrupting the Board's public comment session." ***Id.* at \*8**. The plaintiff Mejia claimed that the repeated instances of using Sheriff Department deputies threatening to arrest speakers chilled her Free Speech exercise. ***Id.*** The court referred to the "use of coercive power." ***Id.*** The court held that "the presence of Sheriff deputies" and the "use of those deputies to remove public speakers" could "lead Mejia to fear a viable threat of prosecution if she did not self-censor." ***Id.* at \*9**. The ***Mejia*** court rejected qualified immunity. ***Id.* at** **\*10**. That court rejected the Board member's argument that he was not legally sophisticated as the "qualified immunity inquiry is an objective standard." ***Id.* at \*11**. Defendants generalize another wrong idea that "protesting" was the only thing prohibited rather than displaying messages on paper or cardboard – call it a sign. They ignore that Dr. Spiehs was banned for simply displaying a flag and a blank piece of paper. But even then bootstrapping its "protesting" nomenclature, the law has been clearly established that a Library is a designated public forum – meaning it is the same as a traditional public forum. Speech in a public forum has well been

established.    Each individual defendant violated Dr. Spiehs clearly established
Constitutional rights.

## Conclusion

This is not Great Britain in decline with its distorted view of what constitutes
"free" speech. **X (formerly known as Twitter) (Jun 3, 2025**
**https://x.com/Osint613/status/1926352416976318738** (London man gets arrested for
saying "Israel is alive").  No, this is an *American* library in the state of Kansas
emulating a grotesque view of the First Amendment.  And remember this is a *public*
*library*.  This is like a book ban in reverse – this library is banning "books" by another
name called "signs" because of its messaging.  How ironic.  There is no conceivable
governmental interest in insulating library patrons from protected speech – or to put
in the words of the Library policy – to insulate them from being distracted from
"study" or "enjoyment" inside this public forum.   That objective is illegitimate
unattached to safety or security.  It is illegitimate disconnected from sound or its
volume.  Simply doing something that a library employee considers to be silently
"protesting" is enough to be put on the Library's naughty list or to have police called
threatening to arrest.  These prohibitions are both overinclusive and underinclusive
with no narrow tailoring.  To say that this library has put a stake in the ground that
it is "not open for First Amendment activities" is to put it mildly.  Not only is it closed
for First Amendment activity, it has criminalized the First Amendment.  Even the
Lawrence City police have become fed up and stopped doing the Library's bidding
regarding this outrageous regime.  This public library has gotten horrendously bad
legal advice in its recreation of the LAX type no-free-speech zone which was patently
unconstitutional in *Board of Airport Comm'rs of City of Los Angeles v. Jews For Jesus,*
*Inc.*, 482 U.S. 569 (1987).   This public city library has set up a vague and

incrementally penalizing no-trespass regime giving its employees unbridled and unguided authority to ban individuals from this public building for doing nothing more than disobeying that employee. Unknown to individuals they are banned from this public building with no recourse for doing nothing more than engaging in protected speech. The entire PITS database scheme is unconstitutional and as applied to Dr. Spiehs, wholly unconstitutional as he is being trespassed for engaging in First Amendment protected speech – and then without any due process.

The Library's go-outside-to-have-free-speech is also grotesque. This library is a public forum. So it is permissible to have library patrons pass through a purported gauntlet of protected speech to enter and exit the library – yet this does not interfere with the patron's "enjoyment" of the library? As to the category the library calls "speakers" any and all protected speech is prohibited at this library under the speculative and hypothetical that it interferes with a library patron's "study" or "enjoyment" – terms hopelessly vague with zero guidelines resulting in a license for arbitrary enforcement. And why do "sponsors" and "co-sponsors" get license to be exempt from this prohibition? So sponsors can carry signs into the Library that hypothetically interfere with study and enjoyment but speakers cannot? What possible rational exists for that classification?

Look no further than Dr. Spiehs as to this arbitrary interpretation and enforcement. When an individual can be banned from this Lawrence library for doing nothing more than carry a blank piece of paper is outrageous. Or how about the way Dr. Spiehs held his flag while allowing Michael Eravi to display his flag (which the employee approved). Think of the deleterious consequence of Dr. Spiehs being a frequent flyer in the PITS database – he was banned from the Library for three

months for doing nothing more than silently carrying a what might be considered a crass sign into the Library.

The Library in its latest version of Policy has enacted its no protest law. It quashes concerns on important topics. All so-called "protests" are banned no matter how quiet or peaceful – if a library supposes it interferes with a patron's "study" or "enjoyment." In that regard the Library has enacted its own "disturbing the peace" in house policy. It condemns innocent conduct by people "who are not blameworthy." This policy that bans all protest incidentally authorize library employees to invoke police to invade civilians lives even beyond a protest context. There is a majority overload as to the many overbroad and unconstitutional applications of the words and phrases prohibited in the Library policy – particularly coupled to the vague connection of doing something to the "study" and "enjoyment" of a hypothetical library patron. There is zero causal connection to imminent danger of violence or property damage. The Policy uses overly expansive definitions for otherwise unprotected expression. It prohibits more expression than the governmental interest warrants. It fails to distinguish between individual and group conduct. It lacks clear standards for administration. This Library scheme allows library employees to "make a crime out of what under the Constitution cannot be a crime." *Coates v. City of Cincinnati,* **402 U.S. 611, 616 (1971)**.

Even if protesting could be banned, under the Library's policy and in the eyes of any particular employee, Dr. Spiehs can be deemed "protesting" when he actually has no intent to do so. In *Counterman v. Colorado*, **600 U.S. 66 (2023)** a defendant was prosecuted for sending threatening messages to a stranger via social media. No proof a *mens rea* was required but the Supreme court held that requiring a "culpable

mental state" is an "important tool" avoiding any chilling of constitutionally protected expression. ***Id.* at 775**. Here, under this vague protest standard, individuals are left "entirely at sea to guess about what [conduct] is allowed." ***Snyder v. United States,* 144 S. Ct. 1947, 1958 (2024)**. This Library does not need this no-speech-zone policy as Lawrence and the state of Kansas have abundant laws regarding disorderly conduct or breach of the peace. This policy only deepens distrust in government actors because it has created opportunities for discriminatory and inconsistent enforcement. ***Thornhill v. Alabama*, at 98** (overbroad laws carry a risk of "harsh and discriminatory enforcement"). Even if Library employees have no intent to discriminate against particular people or viewpoints, this policy imposes that discrimination. These employees are not given clear standards and they are not lawyers or trained in the law which reinforces to different perceptions and inconsistent enforcement.

The Kansas Supreme court in ***City of Wichita v. Griffie*, 544 P.3d 776 (Kan. 2024)** recognized that its disorderly conduct statute criminalized expressive activity that the First Amendment protects, and thus was substantially overbroad. ***Id.* at 787**. Merely disobeying a library employee when the employee demands that Dr. Spiehs stop his protected speech is the stuff of fascism. And to think it is coming from what would otherwise be the pinnacle and bastion of Free Speech – <u>public forum in a public library</u>. This Court should deny the defendants' motion for summary judgment for all the reasons stated above.

| Certificate of Service | /s/Linus L. Baker |
|---|---|
| The above was provided notice to all parties entitled to such notice pursuant to the Court's electronic filing system. | Linus L. Baker, KS 18197 |
| | 6732 West 185th Terrace |
| | Stilwell, KS  66085-8922 |
| | Telephone:  913.486.3913 |
| /s/Linus L. Baker | Fax:         913.232.8734 |
| Attorney for the plaintiff | E-Mail: linusbaker@prodigy.net |
| | Attorney for the plaintiff |